UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                         :          Chapter 7
                                               :
EURO-AMERICAN LODGING                          :          Case No. 06-11325 (SMB)
CORPORATION,                                   :
                                               :
                    Alleged Debtor.            :
                                               :
------------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW


**A P P E A R A N C E S :**

WHITE & CASE LLP
Attorneys for Petitioner, CDR Créances S.A.
1155 Avenue of the Americas
New York, New York 10036

     Howard S. Beltzer, Esq.
     Glenn M. Kurtz, Esq.
     Scott Greissman, Esq.
     Douglas P. Baumstein, Esq.
         Of Counsel


COLE, SCHOTZ, MEISEL, FORMAN
  & LEONARD, P.A**.**
Attorneys for Alleged Debtor
460 Park Avenue
New York, NY  10022-1906

     Joshua J. Angel, Esq.
     Neil Y. Siegel, Esq.
     Frederick E. Schmidt, Esq.
         Of Counsel

KAYE SCHOLER LLP
Attorneys for Gilles Gauthier
425 Park Avenue
New York, New York 10022

      Madlyn Gleich Primoff, Esq.
      David Eskew, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

      This is an atypical single asset real estate bankruptcy case.  CDR Créances S.A. ("CDR"),

a mortgagee, filed this involuntary chapter 7 case against Euro-American Lodging Corporation

("EALC"), its mortgagor, at the same time that CDR was pursuing foreclosure in state court.

EALC, the alleged debtor, opposes the petition.  The principal issue is whether EALC had 12 or

more creditors as of the Petition Date, who held claims that were neither contingent nor subject to

bona fide disputes.

      The Court conducted a three-day bench trial, and the evidence confirmed what one

generally finds in a single asset real estate case.  The managing agent of the property dealt with the

suppliers of goods and services, the alleged debtor had few of its own creditors, and the mortgagee

accounted for substantially all of the debt.  As discussed below, CDR sustained its burden of proof

with respect to the involuntary petition, and relief is ordered.

# BACKGROUND[1]

## A.   The Parties

EALC, a Delaware corporation, owns a multi-story building located at 135 West 52nd

Street in Manhattan (the "Property" or the "Hotel").  (Tr. (9/27-I), at 31-32.)  At all relevant times,

the Property was run as a hotel under a "Contract for Operation of a FLATOTEL Franchise,"

dated June 20, 1991, between Macson Express S.A. and EALC (the "Management Agreement").

(PX 637.)  At some point, Macson Express S.A. assigned its interests in the Management

Agreement to Macson Express USA, Inc., and pursuant to a Hotel Management Sub-Agency

Agreement, dated as of February 14, 2000, Macson Express USA, Inc., a Delaware Corporation,

retained Macson USA LLC, a New York Limited Liability Company, to manage the Property.

(PX 639.)  On or about September 21, 2000, Macson USA LLC filed a Certificate of Assumed

Name, and began operating under the name "Flatotel."  (PX 636A.)  Except where a distinction is

necessary, the Macson entities are collectively referred to as "Macson."

Under the Management Agreement, EALC designed and built the Hotel to operate it as a

franchisee of the FLATOTEL System.  (Management Agreement, at Art. 1.)  The actual

responsibility for operation was vested in Macson, the exclusive United States licensee of the

FLATOTEL Mark and System, (id., at Art. 2(a)), EALC granted Macson the exclusive right to

---

[1]     The following conventions are used in citing to the trial record.  The daily transcript is cited by date and page.  For example, "Tr. (9/29), at 10" refers to page 10 of the September 29, 2006 transcript.  On September 27th, the court reporter did not continue the numbering from the morning session, and instead, started the afternoon transcript with page one.  Consequently, the transcript of that day is cited either as volume 1 (the morning session) or volume 2 (the afternoon session).  Thus, "Tr. (9/27-I), at 10" refers to page 10 of the first (or morning session) on September 27th.  In addition, "PX" refers to the petitioner's trial exhibits and "DX" refers to the alleged debtor's trial exhibits.  Finally, the parties have designated portions of deposition testimony of Jeffrey Stoler ("Stoler Deposition"), (PX 634), and some of that testimony is cited in this opinion.  Any objections to the use of those parts of his deposition testimony are overruled.

use, occupy and operate the Property "as a Hotel Residence in the FLATOTEL System" for the duration of the Management Agreement.[2] (Id., at Art. 2(b).) Among other things, Macson was required to pay all personnel salaries, maintenance and housekeeping costs, accounting or other fees, property insurance, agency commissions, utilities, assessments and a share of the Flatotel advertising and international marketing costs. (Id., at Art. 10, ¶ (j).) Macson had to "present itself to everyone, with the exception of customers, as the Operator of the Hotel Residence Franchised by 'FLATOTEL,'" and indicate to its vendors that it was an "independent concern." (Id., at Art. 10(f).) Jeffrey Stoler, an officer of both Macson and EALC, was the individual that ran the Hotel. (Tr. (9/27-II), at 12-14.)

EALC had few rights or obligations once construction was complete. Stoler, who is also a certified public accountant, described EALC as a holding company, the Hotel as its "investment, " and the day-to-day duties of EALC's Israeli president (Meyer Inny) as non-existent. (Stoler Deposition, at 12-13.) Macson was required, on a quarterly basis, to remit the net operating profit to EALC (after deducting its franchise fee), but EALC was obligated to cover any operating losses. (Management Agreement, at Art. 8.) EALC had the right to examine the accounting and operating books once each year, (id., at Art. 5(a)), and inspect the Property from time to time to verify "the proper functioning of the FLATOTEL Franchise Manual." (Id., at Art. 5(b).) EALC's right to cancel the Management Agreement was limited to non-payment of its fee. (Id., at Art. 14(a).) Notably, it could not cancel if Macson failed to operate the hotel in compliance with the FLATOTEL System or the franchise manual.

---

[2]      The Management Agreement terminates on December 21, 2012, but Macson has two successive renewal options of 10 years each. (Management Agreement, at Art. 2(c), 2(d).)

4

CDR is the successor to Société de Banque Occidentale ("SDBO"), an insolvent French

bank.  In 1990 and 1991, SDBO agreed to loan EALC up to the aggregate approximate amount of

$88 million to acquire and renovate the Property.  (See PX 640, ¶ 100.)  The loan was

collateralized by two recorded mortgages on the Property.  (PX 647, 648.)  EALC also pledged

additional collateral, including all leases and rents relating to the Property and all of its personal

property.  (PX 649.)  The loan agreement included a forum selection clause that conferred

exclusive jurisdiction over disputes in the Paris Commercial Court.  (PX 640, at ¶ 980.)

**B.      Prior Litigation Between the Parties**

Drawn out litigation between CDR and EALC began in the Paris Commercial Court in

1992, and culminated in a judgment, dated Feb. 2, 2003, awarding CDR the principal sum of

$95,837,522 (inclusive of an offset in favor of EALC).  (See PX 655.)  In May 2003, CDR

commenced a foreclosure proceeding, and procured an order appointing Andrew L. Herz, Esq., as

temporary receiver (the "Receiver").  (PX 8.)   The Receiver was authorized, without further

order, to collect all revenues, (PX 8, at 3), make most reasonable and necessary ordinary repairs,

(id., at 4), and incur and pay operating expenses in the ordinary course of business.   (See id.)

After payment of the expenses relating to the care and management of the Property, the Receiver

was directed to retain the net proceeds until further order of the court.  (Id., at 6.)

The proposed receivership order authorized the Receiver to retain an agent to manage the

Property, but the provision was stricken.  (Id., at 4.)  Instead, Macson continued to operate the

Property and collect the revenues, and then wired the funds to the Receiver.  (Tr. (9/27-II), at 20.)

The Receivership creditors still sent their bills and invoices to Macson, and Macson submitted

requisitions and underlying documentation to the Receiver in support of payment.  (Id., at 33-34).

If the Receiver approved the payment, he wired the necessary funds back to Macson who paid the

bill.  (Id., at 34.)  The Receivership was not publicized, and many vendors did not know about it

when they dealt with Macson.  (See id., at 67-68.)

In September 2003, CDR commenced an action in New York state court to recognize the

French judgment.  The state court granted summary judgment to CDR, and in April 2005, entered

a judgment in favor of CDR against EALC in the principal amount of $95,838,152.  (PX 660.)

The judgment referred the computation of unpaid interest to a referee. After the issuance of a

referee's report, the New York Court entered a second judgment, dated October 11, 2005, for

$112,159,088.41 in interest, (PX 666), yielding a combined judgment of $207,997,240.41 (the

"New York Judgment").  As of the Petition Date, EALC owed CDR $224,425,502.74 on account

of the New York Judgment.  (PX 728; Tr. (9/27-I), at 73.)

On May 27, 2005, CDR commenced a second action to foreclose its mortgages on the

Property (the "Foreclosure Action").  (See PX 670.)  The record does not reflect the fate of the

2003 foreclosure suit, but the Receiver remained in place throughout, and Macson continued to

manage the Property.  On October 11, 2005, the New York court granted summary judgment in

favor of CDR, and dismissed all of the defenses to foreclosure raised by EALC and the other

defendants.  (PX 671.)  A judgment of foreclosure was entered on December 1, 2005, (PX 673),

and a foreclosure sale was scheduled for January 4, 2006.  (PX 677.)  The New York Appellate

Division, First Department, stayed the foreclosure sale pending the outcome of appeals filed by

EALC and Macson, provided that Macson pay CDR $1,500,000 per month.  (PX 679.)  The

Appellate Division did not stay the collection of the New York Judgment.  The appeals are still

pending.

**C.      The French Bankruptcy Proceedings and the Chapter 15 Petition**

The present case is intertwined with other proceedings in France.  In February 2001, three

entities, S.N.C. Summersun et cie, S.A. Summersun and S.A.R.L. Summersun Paris (collectively,

"Summersun") were placed into judicial liquidation in the Commercial Court of Antibes.  Mr.

Gilles Gauthier was appointed official judicial liquidator by the Antibes court.  The Summersun

entities were eventually consolidated.

Two orders issued by the Antibes court require mention.  The events leading up to the

orders are recounted solely as background, and are not findings of fact.  According to Mr.

Gauthier, Summersun was supposed to own 65% of the equity in EALC, and a subsidiary of

SDBO was supposed to own the remaining 35%.  Maurice Cohen, a former <u>de facto</u> manager of

Summersun, perpetrated a fraudulent scheme by which he "wrongfully diverted [Summersun's]

interests in EALC to shell companies controlled by his affiliates in order to realize for himself the

economic benefit of the New York Property."  (<u>Supplemental Declaration of Gilles Gauthier, as</u>

<u>Foreign Representative, in Support of Petition for Recognition of Foreign Main Proceedings</u>

<u>Under Sections 1515 and 1517 of the Bankruptcy Code</u>, dated July 17, 2006, at ¶ 5

("<u>Supplemental Gauthier Declaration</u>".) [3]

In February 2006, Mr. Gauthier filed a petition in the Antibes court to extend the

Summersun proceeding to include EALC.  (<u>Emrich Declaration</u>, Ex. 3.)  It appears that CDR and

EALC participated in these proceedings.  On or about March 7, 2006, the Antibes court directed

---

[3]      The Supplemental Gauthier Declaration is attached as Exhibit 2 to the <u>Declaration of Edmund M. Emrich in</u>
<u>Further Support of the Chapter 15 Petition and the Recognition of the Extension Order</u>, dated Aug. 18, 2006 ("Emrich
Declaration")(Case no. 06-10955)(ECF Doc. # 27.)

CDR "to suspend all judicial initiatives tending toward the forced sale of the real estate assets" owned by EALC (the "French Stay Order").[4]  The Antibes court subsequently conducted a hearing on the extension petition on June 28, 2006, and on July 7, 2006, issued an order (the "Extension Order") extending the Summersun judicial liquidation to EALC "with the creation of a unified mass of assets and liabilities."  (Supplemental Gauthier Declaration, Ex. B.)

While the extension petition was still pending, Mr. Gauthier commenced a proceeding in this Court on May 4, 2006, under chapter 15 of the Bankruptcy Code, for recognition of the French judicial liquidation.  CDR, Macson and EALC opposed the Chapter 15 petition, and in particular, the portion of Mr. Gauthier's proposed recognition order that gave effect to the Extension Order, which had been entered after the commencement of the involuntary case.[5]  Given the issues posed by the Extension Order, the Court granted recognition of the foreign proceedings as they pertained to Summersun, but carved out from the recognition the French Stay Order and the Extension Order, leaving the Extension Order for another day.  (Order Granting Recognition and Relief in Aid of Foreign Main Proceedings, dated Aug. 10, 2006  (Case no. 06-10955)(ECF Doc. # 23.)

---

[4]     A copy of the French Stay Order is annexed as Exhibit C to the EALC's limited objection to the entry of a recognition order under Chapter 15, and the limited objection is annexed as Exhibit A to the Certification of Frederick E. Schmidt, dated Sept. 15, 2006 (Case no. 06-10955)(ECF Doc. # 34.)

[5]     The proposed order included the following provision:

> that orders of the Commercial Court of Antibes with respect to the Foreign Proceedings, including without limitation, orders relating to the filing, administration and resolution of claims against and interests in the Foreign Debtors and their assets, are recognized and given effect in the United States unless otherwise specifically ordered by this Court. (Case no. 06-10955) (ECF Doc. # 2, Ex. A.)

D.      **The Involuntary Petition**

On June 12, 2006, CDR commenced this involuntary case acting as the sole petitioning

creditor.  After filing an answer that alleged the existence of 12 or more creditors, (ECF Doc. # 9,

at ¶ 3), EALC filed a statement listing 12 creditors, (see PX 721), in accordance with FED. R.

BANKR. P. 1003(b).[6]  EALC thereafter filed an amended statement listing 14 creditors, (PX 722),

and a second amended statement containing the names of 20 creditors.  (PX 723.)  The three

statements were not signed or dated, but Stoler had reviewed each one before it was filed.  (Tr.

(9/27-II), at 81-84.)  On or about August 7, 2006, EALC filed its Third Amended Creditors List as

of June 12, 2006 Filed Pursuant to B. R. 1003(b) (the "Final Creditor List") (PX 724.)  This list

identified 109 creditors, which EALC eventually pared down to 107.[7]  Stoler signed a declaration,

dated August 1, 2006, certifying under the penalty of perjury that Final Creditor List was "true and

correct."  (PX 725.)

The evolution of the creditors lists raised concerns about the accuracy of the Final Creditor

List.  While the issue of liability is ultimately a legal one, Stoler, a CPA with 30 years of

experience in hotel management, had good insight into who had the right to be paid by EALC.

The hotel vendors – the persons who provided the goods and services needed to make the Hotel

run on a day-to-day basis – dealt with Macson, invoiced Macson and were paid by Macson; EALC

---

[6]      Rule 1003(b) states:

If the answer to an involuntary petition filed by fewer than three creditors avers the existence of
12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses,
a brief statement of the nature of their claims, and the amounts thereof. If it appears that there are 12
or more creditors as provided in § 303(b) of the Code, the court shall afford a reasonable
opportunity for other creditors to join in the petition before a hearing is held thereon.

[7]      At trial, EALC withdrew its contention that the Schindler Elevator Corporation was a creditor. (Tr. (9/27-II),
at 102-103.)  EALC also acknowledged that that the claim held by the World Business Center was disputed.  (See
Euro-American Lodging Corporation's Proposed Post-Trial Findings Of Fact, dated Oct. 30, 2006, at ¶ 39 & n.2)(ECF
Doc. # 54.)  The two debts accounted for nearly $1 million on the Final Creditor List.

never paid a vendor.  (Tr. (9/27-II), at 98-99.)  Stoler understood that the hotel vendors were not

EALC's creditors, and testified at his deposition that the hotel vendors were creditors of Macson,

and EALC was not liable for their debts.  (Id., at 90-92.)

The original list reflected that understanding; it contained only one hotel vendor

(DEP/BCS).  It is difficult to believe that Stoler forgot about the 100 other creditors that made it

into the Final Creditor List.  The exponential increase in the number of creditors, and the fact that

most were hotel vendors, implied that EALC belatedly tailored its definition of "creditor" to defeat

the petition.  There is, nevertheless, a Final Creditor List that identified 109 creditors, and this list

guides the analysis.

## DISCUSSION

Section 303 of the Bankruptcy Code governs involuntary petitions.  Section 303(b) states,

in pertinent part, as follows:

> (b) An involuntary case against a person is commenced by the filing with the
> bankruptcy court of a petition under chapter 7 or 11 of this title –
>
> (1) by three or more entities, each of which is either a holder of a claim
> against such person that is not contingent as to liability or the subject of a bona fide
> dispute as to liability or amount, or an indenture trustee representing such a holder,
> if such noncontingent, undisputed claims aggregate at least $12,300 more than the
> value of any lien on property of the debtor securing such claims held by the holders
> of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or
> insider of such person and any transferee of a transfer that is voidable under section
> 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that
> hold in the aggregate at least $12,300 of such claims.

In addition, Section 303(h)(1) states that where the petition has been timely controverted, the court

shall order relief if "the debtor is generally not paying such debtor's debts as such debts become

due unless such debts are the subject of a bona fide dispute as to liability or amount."[8] Read

together, these provisions establish a four-part test for a contested involuntary petition commenced

by a sole petitioning claimholder: (i) the petitioning claimholder's claim is not contingent as to

liability or subject to a <u>bona fide</u> dispute as to liability or amount, (ii) the petitioning claimholder

is undersecured by at least $12,300, (iii) there are fewer than twelve claimholders (not counting

insiders, employees, transferees of voidable transfers, and holders of contingent or disputed

claims), and (v) the alleged debtor is generally not paying its debts as they come due.  <u>In re</u>

<u>Amanat</u>, 321 B.R. 30, 35 (Bankr. S.D.N.Y. 2005).

CDR easily satisfied the first, second and fourth parts of the test, and they are discussed

briefly.  The principal dispute centered on whether EALC had 12 or more creditors, as of the

Petition Date, that had to be counted under § 303(b), <u>i.e.</u>, Qualifying Creditors.

## A.    CDR Is An Eligible Petitioner

CDR proved at trial that it held a claim that was neither contingent nor subject to a <u>bona</u>

<u>fide</u> dispute.  CDR obtained a judgment against EALC from a French court, and then procured the

New York Judgment based on the French judgment.  As of the Petition Date, EALC owed CDR

---

[8]    The phrase "as to liability or amount" was added to § 303(b)(1) and (h)(1) following the phrase "<u>bona fide</u> dispute" by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  <u>Bankruptcy Abuse Prevention and Consumer Protection Act of 2005</u>, Pub. L. No. 109-8, §§1234(a)(1)(A) and (a)(12), 119 Stat. 23 (April 20, 2005).Prior to the amendment, a dispute limited to the amount was not a "<u>bona fide</u> dispute" as to the entire claim, at least under § 303(b)(1).  E. g., <u>In re Focus Media, Inc.</u>, 378 F.3d 916, 926 (9th Cir. 2004)("a dispute as to the amount of the claim gives rise to a bona fide dispute only when (1) it does not arise from a wholly separate transaction <u>and</u> (2) netting out the claims of the debtors could take the petitioning creditors below the amount threshold of § 303")(internal quotation marks omitted); <u>Key Mech. Inc.</u> v. <u>BDC 56 LLC (In re BDC 56 LLC)</u>, 330 F.3d 111, 120 (2d Cir. 2003) (<u>bona fide</u> dispute exists "where a claim for offset arises out of the same transaction and is directly related to the creditor's underlying claim, and, if valid, could serve as a complete defense to that claim"); <u>see In re Sims</u>, 994 F.2d 210, 221 (5th Cir 1993)(claim that petitioner failed to mitigate damages would serve only to reduce creditor's damage and not create <u>bona fide</u> dispute), <u>cert. denied</u>, 510 U.S. 1049 (1994).  The 2005 amendment presumably eliminated the second part of the test.  <u>See</u> 2 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 303.03[2][b], at 303-30 (15th rev. ed. 2006).  As a result of the amendment, any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a <u>bona fide</u> dispute.  <u>Id.</u>

$224,425,502.74.  The New York Appellate Division stayed the foreclosure sale on the condition

that Macson paid CDR $1.5 million per month, but never stayed the collection of the New York

Judgment.  Since CDR holds an unstayed money judgment of approximately $225 million, its

claim is not contingent or subject to bona fide dispute.  See In re Amanat, 321 B.R. at 37 (the

existence of an unstayed judgment per se establishes that there is no bona fide dispute); In re

Drexler Assocs., Inc., 57 B.R. 312, 314 (Bankr. S.D.N.Y. 1986) ("a judgment which has not been

stayed constitutes a claim which is neither contingent nor the subject of a bona fide dispute."); In

re Drexler, 56 B.R. 960, 967 (Bankr. S.D.N.Y. 1986) ("It would be contrary to the basic principles

respecting, and would effect a radical alteration of, the long-standing enforceability of unstayed

final judgments to hold that the pendency of the debtor's appeal created a 'bona fide dispute'

within the meaning of Code § 303.").

**B.      The Undersecured Portion Of CDR's Claim Exceeds $12,300.00**

CDR also demonstrated that it was substantially undersecured.  CDR's claim of $225

million is secured by the Property.  Jerome Haims, CDR's expert, testified that the value of the

Property, as of the Petition Date, was $101,900,000.  (Tr. (9/29), at 14; accord PX 735, at ¶ 3.)

Haims was eminently qualified, he arrived at his opinion using appropriate valuation

methodology, and provided credible evidence regarding the value of the Property.  EALC did not

call a valuation expert, and its cross-examination of Haims covered only nine pages in the

transcript.  (See Tr. (11/20), at 3-12.)  At the conclusion of Haims' testimony, EALC moved to

strike it on the ground that Haims relied on operating information supplied by CDR's counsel, and

did not independently verify that the information was correct.  (Id., at 14.)  I denied the motion to

strike for the reason that the objection went to the weight rather than the admissibility of Haims'

opinion.  (Id.)

I now conclude that it did not affect the weight of that opinion. Nothing suggests that CDR's counsel supplied incorrect information to Haims, or failed to provide other material information relating to the value of the Property. In fact, there is no evidence that any other material information existed. EALC, given the chance, certainly did not point to any. Lastly, Haims testified that CDR was undersecured by approximately $123 million, or 10,000 times more than the $12,300 in undersecured debt that CDR had to prove. It would take a very big error to make a difference, and EALC failed to show that Haims made even a small one.

**C.    EALC Was Generally Not Paying Its Debts As They Became Due**

CDR proved at trial that EALC was generally not paying its debts as they became due. The "generally not paying" test calls for the consideration of four factors: "(1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the non-payments; and (4) the debtor's overall conduct of its financial affairs." Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer), 202 B.R. 341, 350 (E.D.N.Y. 1996). The failure to pay just one significant creditor can support a finding that the debtor is generally not paying its debts. See id. at 350-51("There is substantial authority for the proposition that even though an alleged debtor may owe only one debt, or very few debts, an order for relief may be granted where such debt or debts are sufficiently substantial to establish the generality of the alleged debtor's default."); In re Amanat, 321 B.R. at 39-40 ("Where a debtor fails to pay even one debt that makes up a substantial portion of its overall liability, a court may find that he is generally not paying his debts."); In re Century/ML Cable Venture, 294 B.R. 9, 31 n. 37 (Bankr. S.D.N.Y. 2003)(" The failure to pay a single debt can satisfy the requirement of generality where the debt is sufficiently substantial.").

EALC owed CDR over $224 million as of the Petition Date. It did not argue that if CDR held an undisputed claim, and EALC failed to pay it, EALC was nevertheless paying its debts as

they became due.  Nor could it.  CDR's claim represented over 90% of the total debt listed on the

Final Creditor List.  (See Post-Trial Memorandum Of CDR Créances S.A. In Support Of

Involuntary Bankruptcy Petition And Entry Of An Order For Relief Under Chapter 7 Of The

Bankruptcy Code In Respect Of Euro-American Lodging Corporation, dated Oct. 13, 2006, at

4)("CDR Post-Trial Memo")(ECF Doc. # 46.)  Given the substantiality of the CDR debt compared

to EALC's other, alleged debts, the length of EALC's default (15 years), and its failure to

maintain a bank account or ever pay any creditors, the Court finds that EALC was generally not

paying its non-contingent, undisputed debts as they became due.

**D.      EALC Had Fewer Than 12 Creditors**

    **1.      Introduction**

The parties went to war primarily over whether EALC had 12 or more non-insider

creditors holding claims that were neither contingent nor subject to a bona fide dispute.[9]  The

alleged debtor in a single petitioner involuntary case has the burden of raising the issue that it has

12 or more creditors.  If the alleged debtor files a list under FED. R. BANKR. P. 1003(b) naming 12

or more creditors, the petitioner has the burden of showing that the debtor actually has less than 12

creditors under § 303(b).[10]  Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d

709, 715 (4th Cir. 1993) ("Bethlehem, as the sole petitioner, had the burden of showing Atlas had

fewer than twelve § 303(b) creditors."); In re Braten, 99 B.R. 579, 583 (Bankr. S.D.N.Y.

1989)("Once the debtor answers that there are twelve or more creditors and files a list of creditors

---

[9]      CDR also contended that 91 of the 109 creditors on the Final Creditor List should not be considered because
they received voidable transfers.  (See PX 729.)  This alternative ground to disqualify EALC's alleged creditors is
discussed in the succeeding text.

[10]      The Court issued an oral discovery order on July 18, 2006, which directed EALC, inter alia, to produce all
documents concerning the claims of and payments to purported EALC creditors.  In some cases, EALC's production
was deficient, (see PX 708), implying a lack of documentary support for listing a claim in the Final Creditor List.

in accordance with Bankruptcy Rule 1003(b), it then becomes the petitioning creditors' burden to put the debtor to the test.").  The Final Creditor List named 109 creditors, and CDR had to show that EALC had less than 12 Qualifying Creditors.

A <u>bona fide</u> dispute exists where "there is an objective basis for either a factual or a legal dispute as to the validity of [the] debt."[11] <u>In re BDC 56 LLC</u>, 330 F.3d at 117-18; <u>accord</u> <u>Platinum Fin. Servs. Corp. v. Byrd (In re Byrd)</u>, 357 F.3d 433, 437 (4th Cir. 2004); <u>Metz</u> v. <u>Dilley (In re Dilley)</u>, 339 B.R. 1, 6 (B.A.P. 1st Cir. 2006) ("Under the objective standard [there is a bona fide dispute], 'if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts[.]'") (quoting <u>In re Lough</u>, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986)); <u>In re Elsa Designs, Ltd.</u>, 155 B.R. 859, 864 (Bankr. S.D.N.Y. 1993) (the bona fide dispute inquiry involves a determination whether factual or legal challenges to claims have "any genuine and objectively determinable legal merit.")  Once the Court identifies a <u>bona fide</u> dispute, the inquiry ends.  "The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute."  <u>In re BDC 56 LLC</u>, 330 F.3d at 118 (quoting <u>In re Rimell</u>, 946 F.2d 1363, 1365 (8th Cir. 1991)); <u>accord</u> <u>In re Byrd</u>, 357 F.3d at 437 ("The bankruptcy court need not resolve the merits of the bona fide dispute, but simply determine whether one exists."); <u>In re Dilley</u>, 339 B.R. at 6 ("The bankruptcy court is not to <u>resolve</u> any genuine issues of fact or law; its inquiry is to determine if such an issue exists.)

---

[11]     The meaning of "<u>bona fide</u> dispute" was clarified, and apparently expanded, under the 2005 amendments to § 303.  <u>See</u> footnote 8, <u>supra</u>.

CDR also asserted that three creditors held contingent claims.  In <u>B.D. Int'l Disc. Corp. v.
Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.</u>), 701 F.2d 1071 (2d Cir.), <u>cert. denied</u>,
464 U.S. 830 (1983), Judge Friendly explained:

> A contingent claim is "one which the debtor will be called upon to pay only upon
> the occurrence or happening of an extrinsic event which will trigger the liability of
> the debtor to the alleged creditor and if such triggering event or occurrence was one
> reasonably contemplated by the debtor and creditor at the time the event giving rise
> to the claim occurred."

<u>Id.</u> at 1073 n.2 (quoting <u>In re All Media Props.</u>, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), <u>aff'd</u>,
646 F.2d 193 (5th Cir. 1981)).

At trial, CDR conceded the existence of only two qualifying creditors, itself and Bryan
Cave LLP.  Thus, the question is whether at least 10 of the remaining 105 creditors identified on
the Final Creditor List must be counted under § 303(b).

1.      **The Hotel Vendor/Receivership Claims**

Schedule 1 attached to CDR's Proposed Findings of Fact ("Proposed Findings")(ECF Doc.
# 47) identified 93 creditors, and 88 invoiced either Macson or the Flatotel, Macson's "dba," for
their goods and services.  The remaining five provided legal services, and invoiced lawyers or a
law firm; these claims are discussed below.[12]  CDR contends that these creditors did not contract
with EALC.  Schedule 2 listed 93 creditors that provided goods or services to the Receiver.
Eighty-seven of those creditors (and their claims) also appeared on Schedule 1, and the near
identity is not surprising since Macson continued to manage the Property day-to-day during the
Receivership.

---

[12]      The five entities, and their corresponding numbers on the Final Creditor List, include: Counsel Press, LLC
(22); Crowe Foreign Services (23); De Pardieu Brocas Maffei (27); Greenhouse Reporting Inc. (50); and TransPerfect
Document Management (101).  In addition, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C. ("Morvillo")
(75), a law firm, billed Macson for its services.

16

The common question is whether the 87 overlapping creditors held undisputed claims against EALC as of the Petition Date.  CDR carried its burden of showing that any claims against EALC were subject to a <u>bona fide</u> dispute.  Prior to and during the Receivership, Macson operated the Property independently of EALC, contracting with the vendors, receiving their invoices and paying their bills, all in Macson's own name.  EALC lacked privity with the vendors.  Where the property management company contracts for the goods or services, receives the invoices and pays them, the vendors are creditors of the property manager, not the property owner, for counting purposes under § 303(b).  <u>In re Cold Harbor Assocs., L.P.</u>, 204 B.R. 904, 911 (Bankr. E.D. Va. 1997); <u>In re Rowe Properties-Progressive Ltd. P'ship</u>, No. 91-33482, 1992 WL 12149040, at *1 (Bankr. E.D. Va. Apr. 22, 1992).

Furthermore, the evidence showed that Macson did not act as EALC's agent.  "Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." <u>Cabrera v. Jakabovitz</u>, 24 F.3d 372, 386 (2d Cir. 1994)(quoting RESTATEMENT (SECOND) OF AGENCY § 1 cmt. b (1958)); <u>accord</u> <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 522 (2d Cir. 2006).  Under the Management Agreement, Macson sublicensed the FLATOTEL Mark and Name to EALC, EALC designed and built the Property to FLATOTEL standards, and then EALC stepped aside and turned the Property over to Macson to run as part of the FLATOTEL System.

As a result, Macson, the franchisor, controlled the operations of the Property owned by EALC, its franchisee.  EALC was left with the few rights afforded a passive investor (inspection of the books and records, its share of the profits and losses) but little else.  It had no right to interfere with Macson's management of the Property, and could cancel the Management

17

Agreement only if Macson failed to pay EALC its share of the profits regardless of how it operated the Property.  Macson was obligated under the Management Agreement to hold itself out as the operator of the Property, and EALC never dealt with the hotel vendors, never paid their bills and never even maintained a bank account to pay them.  If anyone had asked a hotel vendor to identify EALC, it would have been hard-pressed to do so.

During the Receivership, Macson continued to manage the Property, either because the Receiver acquiesced in or affirmatively requested its management services.  The Receiver was appointed three years before the involuntary case was instituted, and served as an officer of the appointing court, rather than as the agent for CDR or EALC.  See Kaplan v. 2108-2116 Walton Ave. Realty Co., 425 N.Y.S.2d 817, 818 (N.Y. App. Div. 1980).   If Macson served as anyone's agent, it served the Receiver.  Macson collected the revenues for the Receiver, turned the receipts over to the Receiver, and after obtaining permission and funds from the Receiver, paid the Receiver's bills.  On the other hand, Macson did not and could not take directions from EALC regarding the management of the Property during the Receivership.

In short, the hotel vendor/receivership creditors were not in privity with EALC, and did not hold any direct claims against EALC.  EALC nevertheless poses two theories to explain why the hotel vendors were creditors of EALC for purposes of § 303(b), even in the absence of privity.  First, they held claims against the Property, which EALC continued to own.  Second, the Bankruptcy Code granted them creditor status.[13]

---

[13]       During the trial, EALC suggested that the hotel vendors held claims sounding in quantum meruit.   (Tr. (9/27-II), at 35-36.)  EALC did not brief the issue post-trial, and I consider it to have been abandoned.  Recovery against EALC in quasi-contract does not, in any event, lie in the hotel vendors' favor.  See Hampton Living, Inc. v. Carltun on the Park, Ltd., 729 N.Y.S.2d 773, 775 (N.Y. App. Div. 2001)(property owner not liable for improvements (continued…)

### a.  Claims Against The Property

State law normally determines the extent of the debtor's interest in property.  Butner v.
United States, 440 U.S. 48, 55 (1979); In re Canney, 284 F.3d 362, 370 (2d Cir. 2002); Morton v.
Nat'l Bank of New York City (In re Morton), 866 F.2d 561, 563 (2d Cir. 1989).  Under New York
law, a temporary receiver appointed in a real estate foreclosure action does not take title to the
mortgagor's property.  The owner's title, use and possession of the property continues, except as
affected by the receivership order, until the equity of redemption is extinguished at the foreclosure
sale.  Trustco Bank, Nat'l Ass'n v. Eakin, 681 N.Y.S.2d 410, 412 (N.Y. App. Div. 1998); Cobb v.
Sweet, 61 N.Y.S. 545, 546 (N.Y. App. Div. 1899); Gracie Tower Realty Assocs. v. Danos Floral
Co., 538 N.Y.S.2d 680, 682-83 (N.Y. Civ. Ct. 1989); see also, Bruce J. Bergman, Bergman on
New York Mortgage Foreclosures § 10.02 (rev. 2005).  Thus, EALC retained ownership of the
Property and the hotel revenues subject, however, to the Management Agreement and the
Receivership Order.

EALC argues that the hotel vendors held interests in EALC's property because they had
the right to payment from the funds in the hands of the Receiver.  While a creditor with a specific
interest in a debtor's property may qualify as a creditor under § 303(b) even though it has no direct
claim against the debtor, see In re BDC 56 LLC, 330 F.3d at 122 (subcontractor/mechanics
lienor's claim against alleged debtor/property owner was subject to bona fide dispute), the Final
Creditor List did not identify any mechanics lienors or other creditors holding a specific interest in
Property (other than CDR and Atlantic Bank).  In addition, although courts have noted that the

---

(…continued)
procured by lessee, despite owner's consent to and some benefit from the work, where vendors contracted with and
rendered performance to lessee, and owner did not assume obligation to pay).

money collected by a receiver comprises a fund chargeable with the expenses of the receivership, see Marine Midland Realty Credit Corp. v. Drake Evergreen Park, 398 N.Y.S.2d 241, 244 (N.Y. Sup. Ct. 1977), this does not equate to a property interest in the funds. Receivership creditors, in this regard, stand on the same footing as general creditors in a bankruptcy estate. The general creditors look to the property of the estate for the payment of their claims, but they are still only general creditors and have no interest in the property of the estate. The same is true of the Receivership's creditors; they can look to the Receiver's funds for payment, but do not have an interest in those funds.

Finally, the cases cited by EALC are distinguishable. Corn Exch. Bank Trust Co. v. Bankers Trust Co., 197 N.E. 259 (N.Y. 1935) ruled that a trustee who paid the expenses of the trust could recover reimbursement from the trust estate. Copeland v. Salomon, 436 N.E.2d 1284 (N.Y. 1982) principally dealt with aspects of the rule that a receiver cannot be sued without the permission of the court that appointed him. In re Atlas Iron Const. Co., 46 N.Y.S. 467 (N.Y. App. Div. 1897) addressed the relative priorities of attaching creditors, lienors and the receiver in the property in his hands. First New York Bank for Bus. v. 155 E. 34 Realty Co., 601 N.Y.S.2d 990 (N.Y. Sup. Ct. 1993) held that the receiver can be directed to pay a condominium's unpaid common charges over the mortgagee's objection, even though the unpaid common charges give rise to a lien subordinate to the mortgage. Bufford v. Bradshaw, 191 N.Y.S.2d 737 (N.Y. Sup. Ct. 1959) involved a premature suit by judgment creditors to establish a priority in the receivership's assets. Finally, Knickerbocker Ice Co. v. Benson, 279 N.Y.S. 86 (N.Y. Mun. Ct. 1935) discussed the receiver's personal liability for his contracts.

### b. Claims Under § 543

EALC also argues that 11 U.S.C. § 543 granted the Receiver's creditors the status of

creditors that must be counted.  Section 543 states in relevant part as follows:

> (a) A custodian with knowledge of the commencement of a case under this title
> concerning the debtor may not make any disbursement from, or take any action in
> the administration of property of the debtor, proceeds, product, offspring, rents, or
> profits of such property, or property of the estate, in the possession, custody, or
> control of such custodian, except such action as is necessary to preserve such
> property.
>
> (b) A custodian shall –
>
>     (1) deliver to the trustee any property of the debtor held by or transferred to
> such custodian, or proceeds, product, offspring, rents, or profits of such property,
> that is in such custodian's possession, custody, or control on the date that such
> custodian acquires knowledge of the commencement of the case; and
>
>     (2) file an accounting of any property of the debtor, or proceeds, product,
> offspring, rents, or profits of such property, that, at any time, came into the
> possession, custody, or control of such custodian.
>
> (c) The court, after notice and a hearing, shall –
>
>     (1) protect all entities to which a custodian has become obligated with respect
> to such property or proceeds, product, offspring, rents, or profits of such property;
>
>     (2) provide for payment of reasonable compensation for services rendered and
> costs and expenses incurred by such custodian. . . .

Section 543(b) requires the custodian, which includes a receiver, <u>see</u> 11 U.S.C. §

101(11)(A), to turn the debtor's property over to the trustee.  Since the receiver may owe debts

that he lacks the wherewithal to pay, § 543(c)(1) provides a mechanism for the bankruptcy court to

"protect" the receiver's creditors.  Even if § 543 gave the Receiver's creditors claims against <u>estate</u>

after the petition was filed, it did not affect their rights against the <u>debtor</u> under non-bankruptcy

law.

Accordingly, the 87 hotel vendor/receivership creditors did not hold claims against EALC

or EALC's property as of the Petition Date.  At a minimum, such claims were the subject to a

<u>bona fide</u> dispute.

21

###### 2.        The Legal Services Creditors

Schedule 1 to the Proposed Findings listed six additional entities, <u>see</u> footnote 12, <u>supra</u>, that provided legal or legal support services; five billed the law firm that hired them and the sixth, Morvillo, invoiced Macson.

###### a.        Morvillo

Morvillo issued several invoices to Macson, (<u>see</u> PX 388-406), and was allegedly owed $205,218.75, as of the Petition Date. (Final Creditor List, no. 75.) The invoices related to legal services incurred in defending EALC in the litigation entitled <u>World Business Center v. Euro-American Lodging Corp</u>. According to the complaint filed in that lawsuit, (PX 614), the plaintiff had entered into a lease with EALC for the second through seventh floors, (<u>id.</u>, at ¶ 4), EALC breached the lease, as amended, (<u>id.</u>, at ¶ 22), and the plaintiff was damaged in the sum of $4,662,000. (<u>Id.</u>, at ¶¶ 25-26.)

Morvillo's claim was not subject to a <u>bona fide</u> dispute. Although Morvillo invoiced Macson, the firm provided legal services to EALC, the lessor under the lease with the World Business Center and the only defendant in the lawsuit. Macson was not a party to the lease or the litigation. Thus, when Macson hired Morvillo, as I assume it did, it acted as the agent for a known principal, EALC. Furthermore, while Morvillo also provided legal services to others, including Macson, (<u>see</u> Tr. (9/27-II), at 144), the unpaid charges evidenced by the firm's invoices did not relate to those other representations.

###### b.        TransPerfect Document Management ("TransPerfect")

The Final Creditor List (no. 101) stated that TransPerfect held a $65.03 claim on account of a "Master DVD of documents produced to CDR in $ Jgmt. XN." The underlying invoice, (PX

595), was issued to Pavia & Harcourt, LLP ("Pavia"), a law firm that represented EALC in the

CDR litigation.  Steven R. Kaplan, the President of TransPerfect, testified that TransPerfect

contracted with Pavia to provide legal support services, and never heard of or dealt with EALC.

(Tr. (9/27-I), at 95-96.)  TransPerfect looked to the law firm that hired it, not the firm's client, for

payment, (id., at 98), and Pavia paid TransPerfect's invoice.  (PX 596.)  Under the circumstances,

it does not appear that TransPerfect could seek payment directly from EALC, but it certainly

appears that any such effort would be the subject of a bona fide dispute.

### c.    Greenhouse Reporting Inc. ("Greenhouse")

Greenhouse was in the same situation as TransPerfect.  Its claim in the sum of $732.75

appeared as item no. 50 on the Final Creditor List, and reflected "Deposition Services."  It was

hired by Pavia, and Pavia paid the invoice.  (Tr. (9/27-I), at 105-06; PX 290B.)  Any claim against

EALC would be subject to a bona fide dispute.

### d.    Crowe Foreign Services ("Crowe")

The Crowe claim in the amount of $1,304.00 was scheduled as item no. 23 on the Final

Creditor List, which stated that it is for "Professional Services."  The bill, which was sent to

Morvillo, related to the service of process in the British Virgin Islands, Liechtenstein and Panama,

and related to a New York litigation entitled Euro-American Lodging Corporation, et al. v. Iderval

Holding Ltd., et al., Index No. 103584-05.  (PX 142.)  Gary Crowe, Crowe's vice president,

testifying by declaration, stated that

> [Morvillo] is the party with which Crowe contracted and the party from which
> Crowe seeks payment.  Crowe views the debt as owing by Morvillo.  EALC has no
> relationship with Crowe and it was not the party with which Crowe contracted or
> which it invoiced.

(PX 142A.)

The Crowe claim is subject to a <u>bona fide</u> dispute for the same reason as the TransPerfect and Greenhouse claims.  In addition, there is no evidence that Morvillo billed EALC for legal services in connection with that litigation.  Hence, there is no evidence that Morvillo represented EALC, or only EALC, in that litigation.

### e.      Counsel Press LLC ("Counsel Press")

Counsel Press, item no. 22 on the Final Creditor List, was scheduled as a creditor holding a claim in the sum of $20,231.97 for "Printing Services."  Counsel Press invoiced Bryan Cave, (PX 139), and Morvillo.  (PX 140.)  No other evidence was offered regarding its claim.  Like TransPerfect, Greenhouse and Crowe, the evidence supports the finding that Counsel Press was hired by law firms to provide legal support services, it did not deal with EALC, it billed the law firms that hired it, and presumably, was paid by those law firms if it was paid at all.  Accordingly, any claim against EALC was subject to a <u>bona fide</u> dispute as of the Petition Date.

### f.      De Pardieu Brocas Maffei ("De Pardieu")

De Pardieu's claim for "Legal Services" in the amount of $7,100 was scheduled on the Final Creditor List as item no. 27.  De Pardieu is a Paris law firm.  De Pardieu was hired by Herrick, Feinstein LLP ("Herrick"), to oppose a motion by CDR, and asked Herrick to pay for its services.  (PX 156.)  As discussed below, Herrick represented the Atlantic Bank.  EALC failed to produce any evidence in response to the Court's July 18th direction showing that De Pardieu represented EALC, or that the debt listed in the Final Creditor List was connected with the

demand for payment of an indeterminate amount evidenced by PX 156.  Accordingly, the claim is

subject to a <u>bona fide</u> dispute.[14]

The foregoing completes the list of creditors attached as Schedule 1 to CDR's Proposed

Findings.  Of the 93, only one, Morvillo, was not subject to a <u>bona fide</u> dispute, and must be

counted for purposes of § 303(b).

### 3.    The Remaining Schedule 2 Creditors

Schedule 2 to CDR's Proposed Findings listed five creditors that did not appear on

Schedule 1.

### a.    New York State Department of Taxation and Finance (the "NYS Tax Department")

The claim of the NYS Tax Department was scheduled as item no. 81 on the Final Creditor

List.  The amount, $247,412.56, reflected liability for "Sales Tax and Franchise Tax."  The debt

was evidenced by a Tax Compliance Levy, dated June 21, 2006, (PX 440), that referred to seven

warrants docketed between September 2002 and July 2005.  CDR did not argue that the tax

obligation belonged to a different entity, such as Macson.  Finally, the Tax Compliance Levy was

dated after the Petition Date, and there was no suggestion that these taxes were paid prior to that

time.  Accordingly, this debt was not subject to a <u>bona fide</u> dispute as of the Petition Date.

---

[14]    Certain of the Atlantic Bank legal bills were ultimately the liability of EALC under an indemnity agreement.
This liability is discussed below in connection with the FATICO claim.  EALC did not contend that the De Pardieu
bills fell into this category.

**b.      City of New York Department of Taxation and Finance (the "NYC Tax Department")**

The NYC Tax Department claim in the sum of $266,579.10 was for "General Corporation Tax, + March – May, 2006 Occupancy Tax."  (Final Creditor List, no. 80.)  A NYC Hotel Room Occupancy Tax Return, dated June 20, 2006, accounted for $263,427.18 of the total.  (PX 431.) The return covered the three months ending May 31, 2006, and indicated that it was due on June 20, 2006, after the Petition Date.  In other words, the tax liability related to a pre-petition period, but the tax return was not due, and the tax was not payable, until after the involuntary petition had been filed.

CDR did not argue that the occupancy tax was not due on the Petition Date.  Accordingly, I find that the occupancy tax claim was not subject to a <u>bona fide</u> dispute as of the Petition Date.

There was no corresponding bill, invoice or tax return evidencing the approximate $3,000 balance of the scheduled claim for general corporation taxes.  The only "proof" was an anonymous schedule purporting to depict the calculation of the debt.  (<u>See</u> PX 432.)  This part of the claim was subject to a <u>bona fide </u>dispute, but since it arose out of a different tax-related transaction, it did not affect the undisputed nature of the claim for occupancy taxes.

**c.      Andrew L. Herz, as Temporary Receiver**

The Final Creditor List, item no. 3, scheduled the Receiver's claim in the sum of $501,646.55, based on "Receiver's fees incurred from April 1, 2005 through March 31, 2006." Under New York law, a receiver may be paid compensation in an amount up to 5% of the funds received and disbursed.  N.Y.C.P.L.R. 8004(a)(McKinney 2003).  Court appointed representatives, including receivers and their counsel, must apply for approval of their compensation, and if the compensation exceeds $5,000, the court must explain its reason for the

award in writing.  NEW YORK RULES OF THE CHIEF JUDGE § 36.04(b)(3).   Pursuant to an

agreement dated July 7, 2003, among the Receiver, CDR, Macson USA LLC, Macson Express

USA, Inc. and EALC, the Receiver agreed to limit his compensation to 2.5% of the gross revenue

generated by the Property.  Any commission was still subject to the approval of the state court,

and the Receiver could apply for court approval on a quarterly basis.  (PX 9.)

As of the Petition Date, no approved fees for the subject year remained unpaid.  The

commissions for the quarters ended June 30, 2005, September 30, 2005 and December 31, 2005,

were not approved until July 2006, after the Petition Date.  (See PX 12, 16, 17.)  The application

covering the commissions for the first quarter of 2006 was not filed until September 2006.  (See

PX 22B.)  Accordingly, any fee claims for the period identified in the Final Creditor List were

contingent on court approval as of the Petition Date, and the Receiver did not count as a creditor

under § 303(b).

### d.      Levine & Glasser, P.C. ("Levine")

The claim of Levine, in the sum of $73,073, was based on its services as the Receiver's

counsel from June 1, 2004 through March 31, 2006.  (Final Creditor List, no. 62.)  The Levine

claim is like the Receiver's.  Consistent with the New York Rules of the Chief Judge, the order

appointing Levin as the Receiver's counsel required the court to "justify the approval of any

compensation to receiver's counsel which can only be done based upon" a fee application.  (PX

328.)   The application covering the fees scheduled in the Final Creditor List was sub judice as of

the Petition Date, and was not approved until July 11, 2006.  (PX 330.)  Accordingly, Levine's

claim was contingent on court approval as of the Petition Date, and Levine  did not count as a

creditor for purposes of § 303(b).

e.      **Jenkins & Huntington, Inc. ("Jenkins")**

The Final Creditor List, item no. 60, identified Jenkins as an "Elevator Consultant" holding

a claim in the sum of $7,605.  Unlike the other hotel vendors, Jenkins billed EALC.  (See DX R.)

Stoler testified that the Hotel was having problems with its elevators; the Property was originally

designed as a condominium, and the excessive use of elevators to service the greater Hotel traffic

led to breakdowns.  Stoler commissioned Jenkins to prepare a study without obtaining the

Receiver's authorization.  (Tr. (9/27-II), at 113.)

Although Jenkins provided the services during the Receivership, the services did not

pertain to the day-to-day operations of the Hotel, and were not rendered for the benefit of the

Receivership.[15]  Instead, the Jenkins study was ostensibly ordered by the property owner, billed to

the property owner, and addressed an extraordinary improvement on the property owner's

property.  CDR failed to explain why EALC, as opposed to Macson or the Receiver, should be

exonerated from liability for this debt, and I find that it was not subject to a bona fide dispute as of

the Petition Date.

4.      **The Remaining Creditors**

The Final Creditor List named 109 creditors.  Two dropped off, the Schindler Elevator

Corporation and the World Business Center, leaving 107.  Two more alleged creditors, Bryan

Cave and CDR, concededly held undisputed claims, leaving 105.  Schedules 1 and 2 attached to

CDR's Proposed Findings accounted for 98 of those remaining 105 creditors.[16]  Only four of the

---

[15]      This probably explains why Jenkins' bill was one of the few that was still unpaid by the time of the trial.
(See Tr. (9/27-II), at 114.)  If the Receiver would not approve it, Macson lacked the funds to pay it.

[16]      Schedule 1 included 93 creditors, and Schedule 2 included five creditors that did not appear on Schedule 1.

98, Morvillo, the NYS Tax Department, the NYC Tax Department and Jenkins, held claims that were not subject to <u>bona fide</u> disputes as of the Petition Date.  In short, there are six creditors, thus far, that count under § 303(b), and only seven more to consider.

### a.    The French Lawyers

The Final Creditor List identified three French lawyers, Guy Ferreboeuf (no. 40), Guy Lesourd (no. 51) and Mina Sarwary (no. 73), who supposedly held claims against EALC as of the Petition Date.[17]  The three claims suffered from similar defects.  The bills produced by EALC were written in French and were not translated, and covered periods when the lawyers represented other parties.  Despite the Court's July 18th order, EALC failed to produce any retention agreements, or agreements obligating EALC to pay the legal fees incurred in the course of representing third parties.  Furthermore, EALC never wrote a check to any of these lawyers. Accordingly, the three claims, discussed in more detail immediately below, were subject to <u>bona fide</u> disputes as of the Petition Date.

### i.    Guy Ferreboeuf

Ferreboeuf's claim against EALC, listed in the amount of 15,000 euros, or approximately $18,750, arose from "Legal Services."  (Final Creditor List no. 40.)  Ferreboeuf had represented EALC in certain French proceedings, (Tr. (9/27-II), at 163-164), but he also represented other parties in France, including Summersun, Iderval, Blue Ocean Finance Limited, World Business Center, Macson and Maurice Cohen.  (<u>Id.</u>, at 173-74.)  Furthermore, he represented other parties in 2006, and brought in Mina Sarwary to represent EALC in the Antibes proceedings.  (<u>Id.</u>, at 174-

---

[17]    The disputed claim held by a fourth French lawyer, De Pardieu, has already been addressed.

75.)  The bills underlying Ferreboeuf's claim were rendered in 2006, (see DX L1-L7), when he represented other parties, but apparently, did not represent EALC.

### ii.    Guy Lesourd

According to the Final Creditor List, EALC also owed Guy Lesourd 15,000 euros, or approximately $18,750, as of the Petition Date.  (Final Creditor List, no. 51.)  His bill was dated June 8, 2006.  (DX Q.)  Steven Skulnik of Pavia testified that he asked Lesourd, a French appellate lawyer, to represent EALC after CDR obtained its judgment in February 2003.   (Tr. (9/27-II), at 164.)  Skulnik admitted that he was not aware of any terms of the retention or any agreement by EALC to pay Lesourd.  (Id., at 177-78)   Furthermore, Lesourd represented Maurice Cohen during 2006, (PX 239, ¶ 8), and there was no evidence that he provided legal services to EALC during 2006.

### iii.    Mina Sarwary

According to the Final Creditor List, EALC owed Mina Sarwary 6,000 euros, or approximately $7,500, for "Legal Services provided before June 12, 2006."  (Final Creditor List, no. 73.)  Sarwary represented EALC and Ospin International, Inc. in the Antibes court during 2006.  (See PX 680.)  Moreover, although her June 10, 2006 invoice, (DX U-2), indicated that EALC was her client, she sent the invoice to Simon Elias, of Gama Holdings, Ltd.  (DX U-1.) Elias was also a Manager of Macson and Ospin.  (See PX 42, at 10.)  Thus, the services depicted in Sarwary's invoice could relate to EALC or another client, and EALC's liability was the subject of a bona fide dispute.

30

### b.    Davis, Graber, Plotzker & Ward, LLP ("Davis")

Davis allegedly provided "accounting services" to EALC, and was owed $4,350.00.  (Final Creditor List, no. 25.)  According to Jeffrey Stoler, Davis provided accounting services to EALC in 2000, (Stoler Deposition, at 6), but Davis was also the accountant for Macson and the Receiver. (Tr. (9/27-II), at 115.)   Davis filed a Certificate of Payment of Taxes on behalf of Macson Express USA, Inc. with the New York Secretary of State on June 17, 2005.  (PX 148A.)  This was done to effect the reinstatement of Macson's authority to do business, which had been withdrawn for non-payment of franchise taxes.  Davis also prepared a report for the Receiver, dated May 18, 2006, relating to the evaluation of information submitted by the management of the Property.  (PX 22.)

The May 1, 2006 Davis bill underlying the claim, (DX I), stated that it was for "services rendered through April 30, 2006, including but not limited to research and review of corporate income franchise sales and use tax liabilities."  The bill did not indicate the period that it covered, and there was no evidence that EALC consulted with Davis regarding a tax problem.  It is true that New York state had docketed warrants against EALC between 2002 and 2005, and had served a levy on Atlantic Bank in June 2006, (PX 440), but Macson also had franchise tax problems that led to the suspension of its corporate authority, and caused it to turn to Davis for help in 2005. Furthermore, the bill corresponds to the period when Davis was completing its report for the Receiver.  Given Davis' service to multiple clients during the period possibly covered by the bill, and the absence of any independent evidence relating to services to EALC in 2006, Davis' claim was subject to a bona fide dispute as of the Petition Date.

### c.    Corporation Service Company ("CSC")

The Final Creditor List indicated that EALC owed $309 to CSC for services as "statutory agent for the service of process" through June 30, 2007.  (Final Creditor List, no. 24.)  CSC

apparently billed one year in advance, because its invoice dated May 6, 2006, called for payment

by June 5, 2006, only one week before the involuntary case was filed.  (PX 143A.)  In fact,

Macson paid the bill on June 15, 2006, (see PX 147), presumably with the Receiver's approval

and in accordance with the procedures previously described.

CSC held a claim as of the Petition Date that was not subject to a bona fide dispute.  CSC's

service as a statutory agent flowed to EALC and no one else, and its annual fee was EALC's debt.

Accordingly, CSC counts as a creditor for purposes of § 303(b).

### d.    Atlantic Bank

Atlantic Bank was listed as a creditor holding a claim in the sum of $20,468,000 based on

a "Mortgage and Note."  (Final Creditor List, no. 6.)  The evidence showed that EALC borrowed

$23 million from Atlantic Bank, and executed a $23 million promissory note, dated April 16,

2003, in its favor.  (PX 38.)  The loan was secured by a mortgage on the Property.  (PX 40.)

Stoler authorized the disbursement of the loan proceeds to Israel Discount Bank ($5,010,208.33),

to several government and other creditors, to a "renovation account" ($3.5 million) and to Macson,

as agent for EALC ($2,019,045.23).  (PX39.)  Stoler testified that the proceeds were used to pay

$8 million to $10 million in real estate taxes, to satisfy a $5 million loan that the Israel Discount

Bank had made to Macson to fund renovations to the Property, to pay various construction

vendors and other creditors and to establish a reserve account for future hotel renovations.

(Tr. (9/27-II), at 71-73.)

CDR does not argue that the claim of Atlantic Bank was contingent or subject to a bona

fide dispute.  Instead, it contends that Atlantic Bank received two fraudulent transfers, and should

not, therefore, be counted as a creditor under § 303(b).  The first challenged transfer involved the

$23 million mortgage delivered by EALC to Atlantic Bank.  CDR insists that EALC did not

receive fair consideration because it did not benefit from the $5 million paid to Israel Discount

Bank or the $3.5 million placed in a renovation account owned by another entity, presumably

Macson.  (CDR Post-Trial Memo, at ¶¶ 86-87.)

I disagree.  EALC received $23 million from the Atlantic Bank.  After EALC acquired

control of the $23 million, Stoler directed Atlantic Bank to disburse the proceeds in a certain

manner.  Atlantic Bank followed his instructions, but did not receive any of the funds.  Hence, it

was not the transferee of the funds.  If the funds were transferred to Israel Discount Bank or a

Macson-controlled renovation account in violation of the fraudulent conveyance laws, the initial

transfer from Atlantic Bank to EALC was still valid, and provided fair consideration for the

mortgage.

The second alleged fraudulent transfer concerned an existing October 8, 2001 mortgage on

the Property in favor of Megainvest Trust Reg., Vaduz ("Megainvest").  (PX 43, 44.)   According

to CDR, EALC assigned the Megainvest mortgage to Atlantic Bank as part of the loan

transaction.[18]  The argument fails for two reasons.  As noted, Atlantic Bank loaned $23 million to

EALC.  Hence, EALC received fair consideration if it transferred the Megainvest mortgage to

Atlantic Bank as part of the loan transaction.[19]  Moreover, the Megainvest mortgage belonged to

Megainvest, not EALC, and did not involve the transfer of EALC's interest in property.

---

[18]        CDR contends that the 2001 Megainvest mortgage was also a fraudulent transfer.  (CDR Post-Trial Memo, at
¶ 90.)   Even if true, the Megainvest mortgage was transferred to Atlantic Bank – not to EALC – and its possible
avoidability has no bearing on whether Atlantic Bank provided fair consideration to EALC in 2003.

[19]        CDR's argument is based on an incorrect premise.  EALC did not assign the Megainvest mortgage;
Megainvest did.

Accordingly, the Atlantic Bank was not the transferee of an avoidable transfer, and counted as a creditor under § 303(b).

     **e.**    **First American Title Insurance Company of New York ("FATICO")**

Finally, EALC contends that it owed FATICO $316,140 on account of "Indemnification – legal bills." (Final Creditor List, no. 42.) FATICO issued a title insurance policy (the "FATICO Title Policy"), dated as of April 16, 2003, in connection with the Atlantic Bank loan and mortgage transaction. The policy insured Atlantic Bank, in the amount of $23,000,000, "against loss or damage sustained or incurred by reason of any current or future enforcement or attempted enforcement of [the CDR Mortgages]." (PX 243.) The FATICO Title Policy provided that FATICO "will also pay the costs, attorneys' fees and expenses incurred in defense against any current or future enforcement or attempted enforcement of the same." (Id.)

Pursuant to a separate Agreement of Indemnity and Reimbursement dated as of April 16, 2003 (the "Indemnity Agreement"), EALC, Gama Lodging LLC and Simon Elias agreed to indemnify FATICO for any expenses, including legal fees, "imposed upon or incurred by or asserted against [FATICO]" that arose out of or related to "the payment or claim for payment" under the FATICO Title Policy. (PX 244, at § 2.) The indemnitors also agreed, "[u]pon demand," to reimburse FATICO "for the payment of" its legal fees. (Id., at § 3.) Herrick, Atlantic Bank's counsel in the New York foreclosure action brought by CDR, sent a series of invoices to FATICO that reflected its legal fees and expenses incurred in connection with that suit. (PX 246-51.) Herrick also provided copies of the bills to EALC. As of September 26, 2006, Herrick had not received any payments from FATICO, and was owed $271,504.76. (PX 252A, 252B.)

34

CDR contends that the FATICO claim is contingent, and does not count under § 303(b).

According to CDR, the proof showed that FATICO never paid Herrick's invoices, and that no

evidence was offered to show that FATICO ever demanded indemnity from the indemnitors.

EALC did not respond to this argument.  Instead, it contended that Herrick sent copies of its bills

to EALC, (Euro-American Lodging Corporation's Proposed Post-Trial Findings of Fact, dated

Oct. 30, 2006, at ¶ 49)(ECF Doc. # 54), which is true, and that "[a]s part of the mortgage loan

transaction with Atlantic Bank, EALC was required to indemnify the title insurance company,

First American Title, for its expenses incurred in connection with defending title.  (Exhibit 244, ¶

3)."  (Euro-American Lodging Corporation's Post-Trial Brief Submitted in Opposition to Entry of

an Order for Relief in Involuntary Chapter 7 Proceedings Filed Against It, dated Oct. 30, 2006, at

16 n.8)("EALC Post-Trial Brief")(ECF Doc. # 53.)  This, too, is true.

The question comes down to whether sections 2 or 3 of the Indemnity Agreement covered

FATICO'S claim, a question that neither party focused on at trial or in their post-trial submissions.

Both sections appear to apply, but differ in two important respects.  Section 2 imposed an

indemnification obligation that did not depend on payment or demand by FATICO.  The

indemnitors agreed to cover FATICO's "Losses," a term that included its legal expenses, and

FATICO could obtain indemnification as the Losses accrued or were sustained.  While § 2 used

the word "reimbursement" in its title, the verb "reimburse" did not appear in its body.  In contrast,

§ 3 required the indemnitors to reimburse FATICO, upon demand, following FATICO's payment

of its legal expenses.

EALC ignored § 2, and relied on § 3 in its response.  (See EALC Post-Trial Brief, at 16

n.8)(citing "¶ 3" of the Indemnity Agreement.)  FATICO had to pay its own expenses to trigger

the reimbursement obligation under § 3, which it admittedly did not do.  Thus, even if copying

35

EALC on the Herrick invoices satisfied the demand requirement under § 3, FATICO's

reimbursement claim was still be contingent as of the Petition Date.

### 5.  Recapitulation

The Court has considered the claims of each of the 109 creditors named on the Final

Creditor List.  The Qualifying Creditors include (1) CDR, (2) Bryan, Cave, (3) Morvillo, (4) the

NYC Tax Department, (5) the NYS Tax Department, (6) CSC,  (7) Jenkins and (8) Atlantic Bank.

The first six appeared on the original 12-creditor list, and of the other six, Schindler Elevator and

World Business Center were withdrawn at the trial and Construction Consulting Associates never

made it to the Final Creditor List.  The ultimate status of the creditors on the original list confirms

the suspicion that it was the closest to being accurate, and EALC thereafter reached for names to

pad the Final Creditor List.

### E.    The Legal Effect of Post-Petition Payments

### 1.    Introduction

CDR offers an alternative argument to limit the number of creditors under § 303(b).  This

argument does not depend on the conclusion that the hotel vendors held claims that were the

subject of bona fide disputes.  After the Petition Date, Macson, presumably with the Receiver's

approval, paid the pre-petition bills of 91 of the 109 creditors on the Final Creditor List.  These

creditors were listed on Schedule 3 attached to CDR's Proposed Findings, and the schedule

included cross-references to the trial exhibits that proved the payments.  The transferee of an

avoidable transfer is not a Qualifying Creditor under 11 U.S.C. § 303(b), and CDR contends that

the 91 creditors received avoidable post-petition transfers.  EALC does not dispute the fact of

payment, but instead, argues that the transfers were not made from estate property, and cannot,

therefore, be avoided.

36

Section 549 generally condemns the post-petition payment of pre-petition debts during the involuntary "gap" period.[20]  It states in pertinent part:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of <u>property of the estate</u> —
>
> > (1) that occurs after the commencement of the case; and
> >
> > (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> >
> > > (B) that is not authorized under this title or by the court.
>
> (b) In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, <u>but not including satisfaction or securing of a debt that arose before the commencement of the case</u>, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

(Emphasis added.)

The filing of an involuntary petition commences a case, 11 U.S.C. § 303(b), and creates an estate.  11 U.S.C. § 541(a).  Upon commencement of the case, and with certain exceptions, the debtor's interests in property become "property of the estate.  11 U.S.C. § 541(a)(1).  As discussed, under New York Law, EALC retained title to the Property and the proceeds of the Property in the Receiver's hands.  These interests became property of the estate when the petition was filed.  The Court did not authorize the payment of any pre-petition debts, and if estate funds were used by anyone, including the Receiver, Macson or EALC, during the gap period to pay pre-petition debts, the payments can be avoided under § 549.

In response, EALC maintains that the Macson paid the 91 creditors with non-estate property, relying on two Code provisions.  First, § 543(b), quoted <u>supra</u>, directs the receiver to deliver "property of the debtor" in his possession to the trustee, and file an accounting of any

---

[20]    The "gap" period refers to the time period between the filing of the involuntary petition and the entry of the order for relief.

"property of the debtor" that came into his possession.  Second, § 541(a)(3) includes property

recovered under § 543 in the definition of "property of the estate."  From this, EALC reasons that

until the estate recovers the "property of the debtor" from the receiver through the turnover

mandated by § 543(b), it is not "property of the estate."  Cf. FDIC v. Hirsch (In re Colonial Realty

Co.), 980 F.2d 125, 131 (2d Cir. 1992)(fraudulently transferred property is not "property of the

estate" until it is recovered).  Since the Receiver caused Macson to pay the 91 claims with

property he never turned over, the transfers did not involve "property of the estate."

The argument confuses "property of the debtor" with "property of the estate."  Section

543(b) only refers to the former, while § 543(a) refers to both.  "Property of the debtor" includes

property that belonged to the debtor but to which the custodian took title.  S. REP. NO. 95-989, at

84-85 (1978); H.R. REP. 95-595, at 370 (1977).  The Receiver never took title to the Property or

its proceeds; title remained in EALC.  EALC's interests became "property of the estate" upon the

commencement of this case, and the provisions of §§ 543(b) and 541(a)(3) do not apply to

property that was already "property of the estate" though still in the hands of the Receiver.

### 2.  The Status of the Remaining Eighteen Creditors

Eighteen creditors on the Final Creditor List did not receive avoidable payments.  Two,

Schindler Elevator and World Business Center, were dropped by EALC.  Six, including Atlantic

Bank, Bryan Cave, CDR, Morvillo, the NYS Department of Tax and Jenkins, held claims that

were not subject to bona fide disputes, and count under § 303(b).  At least six of the remaining ten

creditors would have to qualify under § 303(b) to defeat the petition.

Four of the creditors – Counsel Press, Crowe, Greenhouse and TransPerfect – were hired

by and provided legal support services to law firms.  Their claims were plainly subject to bona

<u>fide</u> disputes.  The remaining six included the four French lawyers – De Pardieu, Ferreboeuf,

Lesourd, and Sarwary – as well as Davis and FATICO.  For the reasons stated, these claims were

also subject to <u>bona fide</u> disputes, or were contingent.  In any event, all six would have to qualify

to defeat the petition.  Since they do not, the Court finds that EALC had less than 12 qualifying

creditors within the meaning of § 303(b) under this alternative theory.

## F.  CDR's Bad Faith

EALC argues that the Court should dismiss the petition as a bad faith filing, or abstain

from entertaining it.  The argument characterizes this as a two-party dispute, and maintains that its

continuation will prejudice EALC's other creditors.  EALC also charges that CDR filed this case

to stay the Appellate Division from issuing a decision that will reverse the lower court's judgment

of foreclosure.  In addition, CDR's counsel advised the state court that CDR could not file an

involuntary petition against EALC.  Finally, EALC argues that CDR violated the Appellate

Division stay by filing the involuntary petition.  (<u>See</u> <u>Euro-American Lodging Corporation's Post-</u>

<u>Trial Brief Submitted in Opposition to Entry of an Order for Relief in Involuntary Chapter 7</u>

<u>Proceedings Filed Against It</u>, dated Oct. 30, 2006, at 22-25)(ECF Doc. # 53.)  These arguments

lack merit.

EALC's challenge invokes the "almost <u>per se</u> rule" pursuant to which some bankruptcy

courts have refused to entertain an involuntary case that involves a two-party dispute.  The district

court in <u>In re Fischer</u>, rejected the "almost <u>per se</u> rule" as inconsistent with the plain meaning of §

303(h)(1).  202 B.R. 347-48 ("a reading of 11 U.S.C. § 303(h)(1) that prevents a single creditor

from obtaining an order for relief on an involuntary petition cannot be reconciled with 11 U.S.C. §

303(b)(2), which allows a single creditor to initiate an involuntary bankruptcy proceeding

provided that there are fewer than twelve creditors."); <u>accord</u> <u>Federal Fin. Corp. v. DeKaron</u>

Corp., 261 B.R. 61, 64 (S.D. Fla. 2001)("Had Congress wanted to provide that the 'generally not

paying' standard could not be met in single/sole creditor cases, it could have (and would have)

said so expressly. I therefore reject the 'almost per se rule' articulated in the cases cited by the

bankruptcy court.").  Instead, the number of creditors is simply one of the factors that must be

considered in determining whether the debtor is generally not paying its undisputed, non-

contingent debts.

　　　　　EALC's other challenges require only brief comment.  EALC speculated that CDR filed

this case to trigger the automatic stay.  Yet CDR consented when EALC moved for relief from the

stay to continue the prosecution of the state court cases.  (See Response of CDR Créances S.A. to

Alleged Debtor's Motion for Relief from Stay to Pursue Pending State Court Appeals, dated July

13, 2006, at 1 ("[A]s EALC would have learned had it contacted CDR before filing the Motion,

CDR consents to the stay relief sought in the Motion.  CDR filed the instant Chapter 7 petition

not, as EALC repeatedly asserts in the Motion, as an act of litigation gamesmanship, but rather

after 15 years of complete non-payment of its mortgage loan.")(ECF Doc. # 14).  The Court

granted the motion, and the appeals are proceeding.

　　　　　Next, the Appellate Division did not stay the filing of an involuntary bankruptcy petition or

the collection of CDR's $224 million debt.  It stayed the foreclosure sale on the condition that

Macson pay CDR $1.5 million per month.  Furthermore, the stay relief granted by this Court did

not extend to the foreclosure, and was limited to the prosecution of the appeals.  (See Order

Granting Relief From Stay, dated July 31, 2006)(ECF Doc. # 29).

　　　　　EALC failed to show how the involuntary petition prejudiced its other creditors, such as

they are.  At most, EALC had eight undisputed, non-contingent creditors as of the Petition Date.

Macson paid CSC and the NYC Tax Department, but the others were not paid, and there is no evidence that they will be paid, or fare any better outside of bankruptcy.

In addition, it is irrelevant whether CDR's counsel told the state court that CDR could not force EALC into bankruptcy. If he did he was wrong. EALC has not shown that judicial estoppel applies based on that statement.

Lastly, abstention or dismissal under 11 U.S.C. § 305 is inappropriate. Section 305(a)(1) allows the Court, after notice and hearing, to dismiss or abstain from hearing a bankruptcy case if "the interests of creditors and the debtor would be better served by such dismissal." The decision to dismiss or abstain is governed by the following factors:

> (1) economy and efficiency of administration;
>
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
>
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
>
> (4) whether there is an alternative means of achieving an equitable distribution of assets;
>
> (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
>
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
>
> (7) the purpose for which bankruptcy jurisdiction has been sought.

In re Paper I Partners, L.P., 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002).

At the outset, EALC never made a motion, as required by § 305.  Instead, EALC stuck its § 305 argument at the end of its post-trial brief.  CDR did make a motion under § 305, but withdrew it after it became an ally of Mr. Gauthier.

Moreover, a chapter 7 case may better serve the interests of all concerned.  CDR could undoubtedly pursue its state court remedies, and if successful, foreclose on the Property.  Since CDR is undersecured, no money would be available to satisfy CDR's entire claim or pay anything to EALC's few unpaid creditors.  Furthermore, EALC and CDR have been fighting with each other for 15 years, and there is no possibility of an out-of-court arrangement.

The bankruptcy court, however, offers other options.  A trustee has many arrows in his quiver.  He could sell the Property through an orderly sale procedure.  As is often the case, the trustee's willingness to sell may depend on CDR's agreement to carve out a portion of the proceeds for the benefit of creditors who would not otherwise be paid.  A trustee could reject the Management Agreement (and discontinue the association with the FLATOTEL System if he or she deemed it appropriate), in favor of a new manager and franchisor.  A trustee can also investigate EALC's financial affairs, and, if appropriate, pursue the recovery of any avoidable pre-petition and post-petition transfers.[21]

In the end, it may turn out that a trustee will abandon the Property, see 11 U.S.C. § 554, and CDR will proceed with a foreclosure.  Or EALC may convert the case to a chapter 11, and CDR will pursue further relief from the stay to conduct a foreclosure sale.  Either situation will

---

[21]     By separate motion, Mr. Gauthier is seeking recognition of the Extension Order.  He hopes to administer the EALC estate, and exercise many of the responsibilities ordinarily vested in a chapter 7 trustee.  The reference to what a trustee might or might not do does not ignore the possibility that Mr. Gauthier might eventually be granted some of these responsibilities.  Rather, the discussion is simply intended to identify the greater options available through a bankruptcy proceeding.

effectively result in a form of abstention; EALC's only asset will be administered outside of bankruptcy.  These future possibilities should not foreclose the chance for a different and arguably better result that is presently possible.

**G.      The Extension Motion**

As just noted, Mr. Gauthier has moved for judicial recognition of the Extension Order. EALC opposes the motion.  The Court prefers to hear the views of a chapter 7 trustee, whose administration would be impacted, before deciding whether or to what extent to recognize the Extension Order.

<strong>CONCLUSION</strong>

EALC had, at most, only eight creditors as of the Petition Date, including CDR, that held claims that were not contingent or subject to bona fide disputes.  Two of the eight received post-petition transfers from property of the estate on account of their pre-petition claims.  EALC was generally not paying these debts as they became due, and accordingly, relief is ordered.  The Clerk is directed to enter an order for relief.  The foregoing constitutes findings of fact and conclusions of law under Fed. R. Civ. P. 52 as made applicable by Fed. R. Bankr. P. 7052.

So Ordered.

Dated: New York, New York
         January 9 2007

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge