```
UNITED STATES BANKRUPTCY COURT                FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                          :           Chapter 7
                                                :
EURO-AMERICAN LODGING                           :           Case No. 06-11325 (SMB)
CORPORATION,                                    :
                                                :
                                                :
                  Debtor.                       :
------------------------------------------------------------X
```

## MEMORANDUM DECISION GRANTING
## MOTIONS TO CONVERT CASE TO
## CHAPTER 11 AND APPOINT TRUSTEE

**A P P E A R A N C E S:**

ROPES & GRAY LLP
Attorneys for Debtor
1211 Avenue of the Americas
New York, New York 10036-8704

    Stuart Hirshfield, Esq.
    David Elkind, Esq.
    Marc Hirschfield, Esq.
        Of Counsel


WHITE & CASE LLP
Co-counsel to CDR Créances S.A.
1155 Avenue of the Americas
New York, New York 10036

    Glenn M. Kurtz, Esq.
    Scott Greissman, Esq.
        Of Counsel


MORGAN, LEWIS & BOCKIUS LLP
Co-counsel to CDR Créances S.A.
101 Park Avenue
New York, NY  10178

    Howard S. Beltzer, Esq.
        Of Counsel

WILLKIE FARR & GALLAGHER LLP
Attorneys for Richard E. O'Connell, Interim
  Chapter 7 Trustee
787 Seventh Avenue
New York, New York 10019-6099

    Alan Lipkin, Esq.
    Theresa Driscoll, Esq.
        Of Counsel


KAYE SCHOLER LLP
Attorneys for Gilles Gauthier
425 Park Avenue
New York, New York 10022

    Madlyn Gleich Primoff, Esq.
    David Eskew, Esq.
        Of Counsel


**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

      The current motions before the Court represent the latest round in a sixteen-year old dispute between the Euro-American Lodging Corporation ("EALC" or the "Debtor") and its mortgagee, CDR Créances S.A. ("CDR"). After CDR filed an involuntary chapter 7 petition and the Court ordered relief, the Debtor moved to convert the case to chapter 11. CDR cross-moved, contending that if the Court granted EALC's motion and converted the case to chapter 11, it should immediately reconvert the case to chapter 7, or alternatively, appoint a chapter 11 trustee. The chapter 7 trustee (the "Trustee") did not formally join in either motion, but did announce his support for CDR's request. For the reasons that follow, the Debtor's motion to convert to chapter 11 is granted, and the motion to appoint a chapter 11 trustee is also granted.

## BACKGROUND

Although the parties disagree on a great deal, they agree on the facts material to the pending motions. In addition, the Court conducted a three-day bench trial in connection with the involuntary chapter 7 petition filed by CDR, and ordered relief for the reasons stated in the Post-Trial Findings of Fact and Conclusions of Law, dated January 9, 2007 (the "Opinion"). (ECF Doc. # 67.) The order for relief was entered the same day, (ECF Doc. # 68), and is final and no longer appealable. Thus, there is a substantial trial record on which to draw.

The Debtor owns a multi-story building located at 135 West 52nd Street in New York, New York (the "Property"). Ospin International Inc. ("Ospin"), an entity controlled by Simon Elias, acquired the Debtor's stock in February 2000. (Affidavit of Simon Elias, sworn to Feb. 13, 2007)("Elias Affidavit"), at ¶ 11)(ECF Doc. # 127.) Shortly thereafter, Ospin transferred the EALC shares to GAMA Lodging LLC ("GAMA"), the Debtor's current sole shareholder. (See Declaration of Steven Skulnik, dated Feb. 12, 2007 ("Skulnik Declaration"), at ¶ 17)(ECF Doc. # 126.) Elias holds an option to purchase the shares of GAMA. (See Elias Affidavit, at ¶ 2.) According to the Debtor's Statement of Financial Affairs, Mayer Iny, a resident of Tel Aviv, Israel, is the Debtor's sole director and its President. Jeffrey Stoler is the Debtor's vice-president, and George Pavia, Esq., a practicing attorney, is the corporate secretary. (See Statement of Financial Affairs, signed Feb. 3, 2007, at 7 (ECF Doc. # 123).)

The Property is operated as the Flatotel pursuant to a "Contract for Operation of a Flatotel Franchise," dated June 20, 1991, between Macson Express S.A. and EALC, as amended (the "Macson Agreement"). (See Statement of CDR Créances S.A. Pursuant to Local Bankruptcy Rule 7056-1 (the "CDR Statement"), dated Feb. 2, 2007, at ¶¶ 58-64) (ECF Doc. #

3

113.)[1] Macson Express S.A. subsequently assigned its rights and obligations to Macson Express USA  (Elias Affidavit, at ¶ 8.)  In February 2000, Elias, through Ospin, acquired all of the stock in Macson Express USA, (Skulnik Declaration, at ¶ 17), and the latter assigned its rights under the Macson Agreement to Macson USA, LLC, a company of which Elias is the president and co-manager.[2]  (Elias Affidavit, at ¶ 11.)  Stoler, the Debtor's vice-president, is also a vice president and chief executive officer of Macson Express USA, (Affidavit of Jeffrey Stoler, sworn to December 13, 2005, at ¶ 1),[3] and an officer and shareholder in Macson USA LLC.  (CDR Statement, at ¶ 61.)  Stoler runs EALC's operations, and Macson's operations vis-à-vis EALC and the Property, on a day-to-day basis.  (See Opinion at 4)("Jeffrey Stoler, an officer of both Macson and EALC, was the individual that ran the Hotel.")

The day after the order for relief was entered, the Debtor filed its motion to convert the case to chapter 11.  (ECF Doc. # 71.)  CDR responded with a Motion for Entry, in the Event Case is Converted to Chapter 11, of an Order Immediately (I) Reconverting Case to Chapter 7 pursuant to 11 U.S.C. §1112(b), or Alternatively, (II) Appointing Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a), dated Jan. 16, 2007  (ECF Doc. # 79.)  The Trustee did not take a position

---

[1]    Unless otherwise noted, citations to the CDR Statement refer to statements of fact that EALC does not dispute.

[2]    Except as noted, no distinction is made among the various Macson entities, and this decision refers to them collectively as "Macson."

[3]    Stoler's affidavit is annexed as Exhibit 18 to the Emergency Motion of CDR Créances S.A. for Entry of Interim and Final Orders (I) Restricting Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363(c)(2) and 363(e) and (II) Providing Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363(e), dated Jan. 10, 2007("Emergency Motion")(ECF Doc. # 69.)

4

on the conversion motion, but argued that "it is in the best interests of creditors that a trustee be appointed for the Debtor regardless of whether this case is in chapter 7 or 11." [4]

At the January 25, 2007 hearing on the motions, the Court advised the parties that it would treat CDR's application as a motion for summary judgment on the issue of whether to appoint a chapter 11 trustee. It directed the parties to file statements pursuant to Local Bankruptcy Rule 7056-1, which they did. At a hearing held on March 27, 2007, the Court denied the Debtor's request for an adjournment, which was opposed by CDR and the Trustee, and the parties rested on their papers without further argument.

## DISCUSSION

**A.     The Debtor's Motion to Convert**

Section 706 of the Bankruptcy Code governs the conversion of a chapter 7 case to a case under chapter 11. It provides in pertinent part as follows:

> (a)     The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable.
>
> . . . .
>
> (d)     Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

Section 706 appears to give EALC an absolute right to convert. This case was not previously converted from another chapter, and EALC is legally eligible to be a debtor under chapter 11. See 11 U.S.C. § 109(b), (d). However, in Marrama v. Citizens Bank of Mass., 127

---

[4]     See Statement of Richard E. O'Connell, Interim Chapter 7 Trustee Regarding: (A) Debtor's Motion for an Order, Pursuant to 11 U.S.C. §706(a) and Rule 1017(f) of the Federal Rules of Bankruptcy Procedure Converting this Chapter 7 Case to a Case Under Chapter 11; and (B) Motion of CDR Créances S.A. for Entry, in the Event Case is Converted to Chapter 11, of an Order Immediately (I) Reconverting Case to Chapter 7 Pursuant to 11 U.S.C. §1112(b), or Alternatively, (II) Appointing Chapter 11 Trustee Pursuant to 11 U.S.C. §1104(a), dated Jan. 24, 2007, at ¶ 9. (ECF Doc. # 103.)

5

S. Ct. 1105 (2007), the Supreme Court concluded that the right to convert was not absolute. There, the debtor sought to convert his chapter 7 case to chapter 13 pursuant to § 706(a). The evidence showed that the debtor had lied about or concealed his assets during the chapter 7 case. The bankruptcy court concluded that the debtor was guilty of bad faith, and denied the motion. The Bankruptcy Appellate Panel and the First Circuit Court of Appeals affirmed.

Resolving a split in the circuits, the Supreme Court also affirmed. Although it agreed with the Bankruptcy Appellate Panel that the right to convert from chapter 7 to chapter 13 is "absolute only in the absence of extreme circumstances" id. at 1109 (quoting Marrama v. Citizens Bank of Mass. (In re Marrama), 313 B.R. 525, 531 (1st. Cir. BAP 2004)), it nevertheless ruled that the debtor's bad faith conduct during the chapter 7 case justified denying the motion to convert:

> Bankruptcy courts . . . routinely treat dismissal for prepetition bad faith conduct as implicitly authorized by the words "for cause." See n.1, supra. In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that individual does not qualify as a debtor under chapter 13. That individual, in other words, is not a member of the class of "'honest but unfortunate debtor[s]'" that the bankruptcy laws were enacted to protect. See Grogan v. Garner, 498 U.S. at 287. The text of § 706(d) therefore provides adequate authority for the denial of his motion to convert.

Id. at 1111.

Although Marrama involved a dishonest chapter 7 debtor's eligibility for chapter 13 relief, it has broader implications. Marrama suggests that if "cause" exists to convert or dismiss a hypothetical chapter 11 case, the chapter 7 debtor seeking to convert to chapter 11 is ineligible for relief under that chapter within the meaning of § 706(d). The prior findings, in this regard, imply that EALC acted in bad faith in defending against the involuntary petition. CDR was the

6

sole petitioning creditor. EALC contended that it had 12 creditors holding undisputed claims, and therefore, that the petition required at least three petitioning creditors. See 11 U.S.C. § 303(b)(1). EALC initially filed a list identifying 12 creditors. See FED. R. BANKR. P. 1003(b). It amended its list twice, increasing the creditor count to 14 and then to 20. EALC then amended the list a third time, and the third amended list (the "Final Creditor List") identified 109 undisputed creditors. The sharp increase resulted from the inclusion of hotel vendors, the persons who provided the goods and services necessary to run the hotel. Stoler certified the final list, and also reviewed the other three lists before they were filed. (Opinion at 9.)

The sudden jump in the number of creditors strongly suggested that the Debtor had tailored the list to defeat the petition. (Id. at 10.) Stoler is not a lawyer, but he is a CPA with over 30 years in hotel management. He knew that the hotel vendors dealt with Macson, invoiced Macson and were paid by Macson. (Id. at 9-10.) He understood that the hotel vendors were creditors of Macson, not EALC, and testified to this understanding at his deposition. (Id. at 10.) The Court expressed difficulty in believing that Stoler overlooked approximately 100 other creditors when he reviewed the original list. (Id.) Thus, the evidence confirmed "the suspicion that [the original list] was the closest to being accurate, and EALC thereafter reached for names to pad the Final Creditor List." (Id. at 36.)

The Debtor's conduct in defending against the involuntary petition arguably provides grounds for denying the conversion motion. It is unnecessary, however, to decide the question, because remaining in chapter 7 raises problems for the Debtor, its creditors and the estate. The Debtor is a viable, operating business, and its greatest value rests in its continued operation. The chapter 7 trustee's mission, on the other hand, is to liquidate the assets of the estate. 11 U.S.C. § 704(a)(1). Although the Court can authorize the trustee to operate the business, which it has

7

done, the authorization must be for a limited period and "consistent with the orderly liquidation of the estate." 11 U.S.C. § 721. The better alternative is to convert the case to chapter 11, where the Debtor is free to operate and can but is not under a duty to liquidate, and appoint a chapter 11 trustee as an estate fiduciary. Cf. 11 U.S.C. § 1104(a)(3)(authorizing the court to appoint a chapter 11 trustee, rather than convert or dismiss the case under § 1112, if it serves the best interest of creditors and the estate)(quoted immediately below). The reasons justifying the appointment are discussed in the next section of this decision.

**B.    CDR's Motion to Reconvert or Appoint a Chapter 11 Trustee**

Section 1104(a) of the Bankruptcy Code governs the appointment of a chapter 11 trustee. It provides:

> (a)    At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (3)    if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

The appointment of a § 1104 trustee is an extraordinary remedy. In re University Heights Ass'n, Inc., No. 06-12672, 2007 WL 316281, at * 2 (Bankr. N.D.N.Y. Jan. 22, 2007); In re Adelphia Comm'ns Corp. 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006), aff'd, 342 B.R. 122 (S.D.N.Y. 2006); In re Ionosphere Clubs, Inc., 113 B.R. 164, 167 (Bankr.S.D.N.Y.1990). The

8

movant must prove the need for a trustee by clear and convincing evidence. In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3d Cir.1989).

    **1.    Section 1104(a)(1)**

The Court has already addressed the Debtor's conduct in padding the creditors list to defeat the involuntary petition. Dishonesty provides a reason to appoint a chapter 11 trustee under § 1104(a)(1). In addition, the Debtor has been guilty of "gross mismanagement" within the meaning of § 1104(a)(1). "Gross mismanagement" includes the chronic failure to pay taxes, particularly where the failure leads to liability for interest and penalties. In re Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985); In re Great Northeastern Lumber & Millwork Corp., 20 B.R. 610, 611 (Bankr. E.D. Pa.1982); cf. Travelers Ins. Co. v. 633 Third Associates, 14 F.3d 114, 123 (2d Cir. 1994)(intentional failure by a mortgagor in possession to pay property taxes constitutes waste actionable by the mortgagee). EALC has not filed any federal, New York State or New York City corporate income or franchise tax returns since EALC was acquired by Elias in 2000.[5] (See CDR Statement, at ¶ 37.)

The Debtor also failed to pay real estate taxes. (Id. at ¶ 38.) Its current management was in possession of the Property from February 2000 until the May 2003 appointment of the Receiver. (Id. at ¶ 53.) By June 2002, New York City had already imposed tax liens against the Property totaling $5,835,582.14 for unpaid taxes, interest and other charges. (Id. at ¶ 39.) The Debtor eventually paid $6,311,827.14 to extinguish the tax lien. (Id. at ¶ 41.) In September 2003, the New York Supreme Court cited the failure of EALC's management to timely pay

---

[5]    EALC's financial reporting has been equally abysmal. The Debtor has not prepared any corporate financial statements since Elias's 2000 acquisition. (CDR Statement, at ¶ 48.) Although the Debtor contends that it was not obligated to prepare financial statements, its financial and tax reporting history does not bode well for its compliance with the rigorous reporting requirements of the Bankruptcy Code and Rules.

9

taxes, and the risk of a tax foreclosure sale of the Property, as a basis for denying EALC's motion to vacate a receivership over the Property.  (Id. at ¶ 42.)

In addition, the Debtor failed to pay sales and use taxes to the State of New York.  As a result, the state issued nine tax warrants evidencing outstanding tax judgments docketed against EALC with the New York County Clerk's office, totaling $623,251.64.  (Id. at ¶ 44.)  EALC also listed an undisputed claim by New York State in the amount of $247,412.56 on its Final Creditor List.  The underlying debt represented unpaid sales tax, and resulted in the issuance of tax warrants against EALC.  (Id. at ¶ 45.)  The Tax Compliance Levy, which identifies the unpaid taxes, indicates that the vast majority accrued while the Debtor's current management, through Macson, was in possession of the Property.  (See Emergency Motion, Ex. 14.)

Finally, EALC's authority to do business as a foreign corporation in New York was annulled by the New York Secretary of State in 1997 pursuant to the Tax Law, and was never reinstated.  (CDR Statement, at ¶ 49.)

The Debtor's chronic failure to pay taxes has led to liability for interest and penalties.  To the extent CDR paid the real estate taxes (including interest and penalties), the amounts will be added to its secured debt and further encumber the Property.  In addition, the failure to pay franchise taxes has stripped the Debtor of the authority to do business in New York.

### 2. Section 1104(a)(2)

In determining whether a trustee should be appointed under section 1104(a)(2), "in the interests of creditors," courts "look to the practical realities and necessities."  In re Ionosphere Clubs, Inc., 113 B.R. at 168.  Although decisions have articulated certain factors to guide the court, see id. ("Among the factors considered are (i) the trustworthiness of the debtor; (ii) the

10

debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." (citations omitted)), the standard is a flexible one. In re Sharon Steel Corp., 871 F.2d at 1226; In re Ionosphere Clubs, Inc., 113 B.R. at 168; In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518, 527 n. 11 (Bankr. E.D.N.Y. 1989)("the factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion"). Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no "cause" exists. In re Marvel Entertainment Group, Inc., 140 F.3d 463, 474 (3d Cir. 1998); In re Sharon Steel Corp., 871 F.2d at 1226; In re Ionosphere Clubs, Inc., 113 B.R. at 168. The Court has broad discretion, In re Sharon Steel, Corp., 871 F.2d at 1226, and at bottom, "it seems that § 1104(a)(2) reflects 'the practical reality that a trustee is needed.'" In re V. Savino Oil, 99 B.R. at 527 n. 11 (quoting In re Sharon Steel Corp., 86 B.R. 455, 458 (Bankr. W.D.Pa.1988)).

A chapter 11 debtor and its managers owe fiduciary duties to the estate. Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.), 227 B.R. 606, 612 (S.D.N.Y. 1998). Where they suffer from material conflicts of interest, an independent trustee should be appointed under § 1104(a)(2). E.g., In re Microwave Prods. Of Am., Inc., 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989)(chapter 11 trustee appointed where debtor was not in a "strong position" to pursue possible claims due to a conflict of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate"); In re McCorhill Publ'g Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (conflicting interest in various related entities held by the debtor's directors warranted the

11

appointment of a trustee); In re Humphreys Pest Control Franchises, Inc., 40 B.R. 174, 176-177 (Bankr. Pa. 1984) (an independent trustee was needed to protect the interests of creditors when "an obvious conflict of interest exists in the management of the two [] corporations because the officers and principals of the parent corporation are the same individuals as the officers and the principals of the debtor."); In re Great Northeastern Lumber & Millwork Corp., 20 B.R. at 611-12 (the "appointment of a trustee to investigate the circumstances of the debtor and its relationship to other entities" was in the interest of all of the debtor's creditors pursuant to §1104(a)(2)); In re Philadelphia Athletic Club, Inc., 15 B.R. 60, 62-63 (Bankr. Pa. 1981)(appointing a trustee in the best interests of the creditors when the principals of the debtor occupied conflicting positions in transferee companies); Smith v. Concord Coal Corp. (In re Concord Coal Corp.), 11 B.R. 552, 554 (Bankr. W. Va. 1981) (appointment of a trustee was justified where loyalty of debtor's current management was called into question due to competing business interests and potential for intercompany dealings); In re L.S. Good & Co., 8 B.R. 312, 315 (Bankr. W. Va. 1980) (appointing trustee under § 1104(a)(2) where "[t]he magnitude of the number of intercompany transactions places current management [of the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor].")

### 1.    Macson

EALC's Schedule G identifies four executory contracts and/or unexpired leases: two with Macson affiliates, one with 135 W 52nd St. Restaurant LLC ("Moda") and one with Alexico Management Group, Inc. (See Schedules, signed Feb. 3, 2007/ (ECF Doc. # 122).) Macson

12

Express S.A. is not listed as the non-debtor party to any agreement. I assume that the Macson Agreement is subsumed within the general reference to the agreements with Macson Express USA and Macson USA LLC..

The Macson Agreement (or agreements) is the Debtor's principal contract. Potential disputes between Macson and the estate illustrate why a trustee is necessary. CDR has contended that the Macson Agreement is unfair, and should be rejected. The Debtor disagrees, but in any event, has taken a position that may make rejection impractical even if the agreement is unfair. Its Schedules and other filings since the entry of the order for relief assert that the Macson Agreement is actually a <u>lease</u>. This is a significant concession. If the Macson Agreement is a lease within the meaning of § 365, and the Trustee rejects it, Macson will have the rights granted under 11 U.S.C. § 365(h).[6] It can remain in possession during the existing

---

[6] Section 365(h) states, in pertinent part:

(h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—

    (i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

    (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

    (B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

13

term of the Macson Agreement (expiring on December 31, 2012), and the two successive renewal periods of 10 years each. (Macson Agreement, at Art. 2(c), (d).)

The status of the Macson Agreement is not quite as apparent to the other parties or to the Court. Initially, non-bankruptcy law determines whether the Macson Agreement is a lease. See Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.), 804 F.2d 193, 197 (2d Cir. 1986). The Macson Agreement provides that the laws of the French Republic govern its interpretation. (Macson Agreement, at Art. 19(a).) A New York court will generally enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the transaction and does not violate New York's public policy. National Oil Well Maint. Co. v. Fortune Oil & Gas, Inc., No. 02 CV. 7666(LBS), 2005 WL 1123735, at *2 (S.D.N.Y. May 11, 2005); Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc., 587 F. Supp. 557, 560 (S.D.N.Y. 1982); cf. Andin Int'l Inc. v. Matrix Funding Corp., 756 N.Y.S.2d 724, 726-727 (N.Y. Sup. Ct. 2003)(refusing to enforce provision of computer lease that chose Utah law where computers were delivered to and used in New York, never passed through Utah, payments were made to the seller, a Utah corporation, in Oregon, and the automatic renewal provisions in the lease violated New York law). No party has offered any proof relating to the proper characterization of the Macson Agreement under French law, assuming that French law governs.

Furthermore, if New York law ultimately controls, the Macson Agreement may not meet the definition of a "lease." Under New York law, the transfer of absolute control and possession at an agreed rental distinguishes a lease from a different arrangement. Feder v. Caliguira, 171 N.E.2d 316, 318 (N.Y. 1960)(Fuld, J.); Plaza v. City of New York, 759 N.Y.S.2d 748, 751 (N.Y. App. Div. 2003). If the parties simply share the revenues generated by the property, but the possessor of the property is not obligated to pay rent, the arrangement is not a lease. Feder, 171

14

N.E.2d at 318.  In this case, the Macson Agreement does not obligate Macson to pay rent; instead, it must pay EALC the net operating profit generated by the Property, after deducting its franchise fee.  (Macson Agreement, at Art. 8)  If the Property loses money, EALC must cover the shortfall.  (Id.) ("in the event of an operating loss by [Macson], EALC is obligated to cover the loss quarterly, upon proof, at the request of [Macson].")  In short, the parties share the revenues but EALC bears the losses; if this is a "lease," it is one under which the "lessor" may have to pay "rent" to the "lessee."

Finally, while the Macson Agreement grants Macson the exclusive right "to use, occupy and operate" the Property as a hotel in the FLATOTEL System, (see id., at Art. 2(b)), the English translation of the Macson Agreement[7] does not use the word "lease."  Cf. Dunes Hotel Assocs. v. Hyatt Corp. (In re Dunes Hotel Assocs.), 212 B.R. 110, 120 (Bankr. D.S.C. 1997)(hotel management agreement, as amended, that described itself as a "lease" created a lease under South Carolina law for purposes of 11 U.S.C. § 365(h)).  Furthermore, other parts of the Macson Agreement characterize the relationship between the parties as a franchise.  (See Macson Agreement, at Arts. 1, 15(a).)

The foregoing is not intended to constitute a finding that the Macson Agreement is a lease or that is unfair or burdensome to the estate.  Nevertheless, these questions are critically important to the estate, and it appears premature for the Debtor to take the position that the Macson Agreement is a lease.[8]  Common ownership and overlapping fiduciary duties may be to

---

[7]    The Macson Agreement, at Art. 19(a), states that French version "will take precedence" over the English translation.

[8]    The Debtor has stated that CDR's predecessor-in-interest either participated in the preparation of or approved the arrangement with Macson.  The argument misses the point.  The fairness and possible rejection of the Macson Agreement are issues that concern the estate, not just CDR.

15

blame. Stoler is the most obvious case. He is effectively the chief operating officer of the Debtor, and is also an officer of Macson. Moreover, Macson, not the Debtor, pays his salary. (CDR Statement, ¶ 101.) In addition, he has worked for Elias on other real estate projects for 25 years. (See id. at ¶ 102.) Elias is one of the owners of Macson, holds an option to acquire GAMA's shares, and at a recent discovery conference, EALC's own counsel observed, "[t]here is no dispute that Mr. Elias has an interest in the Debtor and that he has an interest in the entity [i.e., Macson] that operates it." (Transcript of discovery conference, held Feb. 16, 2007, at 5 ("Tr. (2/16)"))(ECF Doc. # 152.) Hence, Stoler and Elias suffer from divided loyalties, and cannot exercise independent judgment on behalf of the EALC estate regarding its disputes with Macson.

The same conflict affects the claims resolution process. The Debtor's Schedules list a disputed debt of $11,667,501.46 owed to Macson. (See Debtor's Schedule F). Aside from the undersecured claim of CDR or Atlantic Bank, or both, the Macson claim is the largest unsecured debt in the case. Stoler or Elias, or both, will have to decide whether Macson should file a claim in the case. If it does not, it will not be entitled to a distribution, and its pre-confirmation claim may be discharged.[9] If Stoler or Elias, or both, decide that Macson should file a claim, then Stoler, and possibly Elias, will then have to decide whether EALC should object to it. If EALC fails to object, the Macson claim will be deemed "allowed." 11 U.S.C. § 502(a).

---

[9] Confirmation generally discharges a debtor's pre-confirmation debts. 11 U.S.C. § 1141(d)(1). A corporate debtor that liquidates all or substantially all of its assets and does not engage in business after consummation does not receive a discharge. 11 U.S.C. § 1141(d)(3). Thus, if EALC sells the Property and then goes out of business, it will not receive a discharge. In that event, however, there will not be any assets to pay the undischarged debts.

16

The foregoing demonstrates that Stoler and Elias sit on both sides of the Macson-EALC equation. The estate needs an unconflicted fiduciary to represent its interests on the issues between them.

### 2. Moda Restaurant

The issues surrounding EALC's 2001 lease with Moda (the "Moda Lease") highlight the same conflicts. The Moda Lease allows Moda to operate a restaurant on the ground floor of the Property. (CDR Statement, at ¶ 66.) Elias and Stoler are members of Moda. (Id. at ¶ 67.) EALC will have to decide whether to assume or reject the Moda Lease. Furthermore, the Debtor's Schedule B shows that Moda owes EALC $3,010,901.00. EALC must collect the receivable and monitor Moda's obligations to ensure that Moda performs them. Stoler and Elias sit on both sides of this dispute as well, and they cannot avoid the inherent conflict caused by their divided loyalties.

### 3. Atlantic Bank

According to Debtor's Schedule D, Atlantic Bank holds a $23 million secured claim that is not contingent, disputed or unliquidated. This is the second largest claim in the case, and if the state court determines that CDR's lien is invalid, Atlantic Bank will hold the largest secured claim.

The Debtor also faces similar conflicts in addressing the rights of Atlantic Bank. According to Debtor's Schedule H, EALC's co-debtors liable on the Atlantic Bank debt include GAMA, Macson, Ospin and Elias. They have a substantial economic interest in making sure that EALC pays as much as possible to Atlantic Bank, and cannot be expected to investigate any possible challenges to the validity or extent Atlantic Bank's lien or claim.

### 4. Other Considerations

The unique circumstances of this case suggest additional reasons to appoint a chapter 11 trustee. First, the appointment of a trustee will not affect the Property. Stoler "described EALC as a holding company, the Hotel as its 'investment,' and the day-to-day duties of EALC's Israeli president (Mayer Iny) as non-existent." (Opinion, at 4.) Macson operated the Property before bankruptcy, initially on its own, and thereafter, under the auspices of the state court receiver. (CDR Statement at ¶53.) After the entry of the order for relief, the Trustee displaced the receiver, but relied on Macson to continue to operate the Property. If the same or a different person is appointed to act as chapter 11 trustee, he or she will presumably continue to use Macson, at least until the issue pertaining to the rejection of the Macson Agreement has been resolved. Hence, the appointment of a chapter 11 trustee will not affect the operations of the Debtor's sole business; it will continue to be operated by the same entity that has been managing it for several years.

Second, the Debtor intends to hire an independent manager anyway. At the aforementioned discovery conference, the colloquy turned to who at the Debtor would review the Macson Agreement to determine its fairness. (Tr. (2/16), at 5-7.) EALC's counsel responded that it had hired a "restructuring officer" who would report to the Court. (Id. at 6.) EALC's acknowledgment that it needs outside operational management is an "important factor" in deciding to appoint a trustee under § 1104(a)(2). Microwave Prods., 102 B.R. at 676. Moreover, the Debtor can fire whomever it hires. Id. If someone must be hired to report to the Court, the United States Trustee rather than the Debtor should select the new fiduciary. And unlike the Debtor's employees, the trustee will be bonded for the faithful performance of his or her duties. See 11 U.S.C. § 322(a). Furthermore, the estate will save the cost of paying the proposed

18

restructuring officer, and the savings will offset the additional cost resulting from the trustee's appointment.

Third, the creditors do not have confidence in the present management. According to the Debtor's Schedules, CDR holds over 73% of the total debt. It has pressed for a trustee, complaining that it has not received any payments in over 15 years. It points out that the Property has never generated enough of an operating profit to throw off any payments to EALC. CDR also contends that given the size of its claim, it holds a blocking vote, and the Debtor cannot confirm a plan without its consent. No other creditor has stepped up to support EALC's continued management of the estate's affairs.

Lastly, the appointment of the trustee is consistent with, and may actually promote, EALC's announced goals. EALC has stated that it intends to sell the Property under a chapter 11 plan for $105 million. (Transcript of hearing held Jan. 25, 2007, at 7, 21.) (ECF Doc. # 121.) Its shareholders have no equity, and a trustee, who represents the estate, has a greater interest in managing the sale process. In addition, the Debtor may face legal obstacles in trying to sell its only asset under a plan filed during the exclusivity period, without affording the opportunity to test the market. Cf. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434, 458 (1999)("new value" plan filed by junior interests in single asset real estate case "free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).") The appointment of a trustee will terminate exclusivity, see 11 U.S.C. § 1121(c)(1), and allow any other party in interest to file a plan. Thus, it will open up the process to competition.

## CONCLUSION

Based on the foregoing, the Court concludes that the case should be converted from chapter 7 to chapter 11, and that a chapter 11 trustee should be appointed for two independent reasons, to wit, the Debtor's gross mismanagement and the best interest of creditors and the estate. The United States Trustee is directed to appoint a chapter 11 trustee, and apply for approval of the appointment, in accordance with Interim Federal Bankruptcy Rule 2007.1. Finally, the chapter 11 trustee is directed to file a response to the pending Extension Motion, (see Opinion, at 43), within 30 days of his or her qualification. Thereafter, the parties should contact chambers to secure a hearing date for the Extension Motion. Settle an order on notice consistent with this decision.

Dated: New York, New York
April 3, 2007

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge